## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| BRANDALL BRAWNER, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS and ENSIGN PEAK ADVISERS, INC.,<br><br>        Defendants. | Case No.:<br><br><br><br><br><br><br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

## I.    INTRODUCTION

1.    Plaintiff Brandall Brawner ("Plaintiff"), individually and on behalf of the other members of a Nationwide Class or Statewide Class defined below (the "Class" or "Class Members") bring this Class Action Complaint against Defendant Corporation of the President of the Church of Jesus Christ of Latter-Day Saints ("LDS Corporation") and Defendant Ensign Peak Advisers, Inc. ("Ensign" or "EPA") (collectively, "Defendants") seeking redress and remedy for 1) fraudulent misrepresentation; 2) negligent misrepresentation; 3) violation of the Tennessee

Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101, *et seq.*; 4) breach of fiduciary duty; 5) unjust enrichment; and 6) civil conspiracy, arising from Defendants misrepresenting to Plaintiff and Class Members that their monetary contributions, known as "tithing" or "tithing funds", *were not* being used for commercial, for-profit purposes when, in fact, Defendants used at least $1.4 billion in tithing funds to finance a commercial, for-profit shopping mall during relevant times, and have otherwise diverted tithing funds for profit-generating, non-charitable purposes.

2.      Plaintiff makes these allegations upon personal knowledge as to himself and his own acts and as to all other matters upon information and belief.

3.      None of the allegations in this Class Action Complaint arise from the religious beliefs, religious practices, religious doctrines, or organizational governance of the Church of Jesus Christ of Latter-Day Saints ("LDS Church") or its members.  In other words, this case has nothing to do with, and does not implicate, the First Amendment and/or the Free Exercise Clause in the Constitution of the United States.

4.      Rather, the allegations in this Class Action Complaint arise solely from specific public statements made by Defendant LDS Corporation, the corporate arm of the LDS Church, EPA, and their agents and employees regarding the use of tithing funds for commercial, for-profit business enterprises, including but not

limited to City Creek Center in Salt Lake City, Utah, and the sources for funding these commercial, for-profit business enterprises, and the use of tithing funds to finance non-charitable purposes more generally.

5. Plaintiff brings this action on behalf of himself and all other Class Members residing in the United States who paid monetary donations ("tithing" or "tithing funds") to Defendants whose tithing funds were used for commercial, for-profit purposes.

6. The reason this is problematic is that it is diametrically opposed to representations made by Defendants to the members of the Class. Specifically, from April 5, 2003 to October 5, 2012, Defendants and their agents and employees—including the president of the LDS Church who was also a member of Defendant LDS Corporation—made repeated representations, in both video broadcasts and print publications, to Plaintiff and Class Members that tithing funds *were not* being used for commercial, for-profit purposes and in particular, more specifically *were not* being used to finance the purchase of land and development of City Creek Center mall ("City Creek Center") in Salt Lake City, Utah. These statements were made in part because of concerns by LDS Church members that Defendant LDS Corporation was doing just that.

7. In December 2019, David Nielsen, a senior portfolio manager with Defendant Ensign Peak Advisors ("EPA"), a corporate entity that acted as the

investment division of Defendant LDS Corporation, filed an IRS Whistleblower Complaint alleging that Defendants had used $1.4 billion in tithing funds to finance City Creek Center.

8.     The IRS Whistleblower Complaint revealed that the $1.4 billion used to finance City Creek Center, a for-profit business enterprise, was drawn from EPA's treasury account *which contained never-invested tithing funds.*

9.     David Nielsen further set forth in his IRS Whistleblower Complaint that the LDS Church should lose its tax exempt status because the money was not used for charitable purposes, noting that Defendants had amassed over $100 billion in assets while not returning any money for religious, educational, or charitable purposes in twenty-two (22) years to the LDS Church.

10.     The misrepresentations made by Defendant LDS Corporation through its agents and employees—including the president and other high-ranking leaders of the LDS Church—that tithing funds *were not* used to finance City Creek Center or other commercial, for-profit purposes—were false, intentional, and made to induce Plaintiff and Class Members to continue paying tithing funds in spite of Defendants having amassed $100 billion in assets and using member donations for commercial, for-profit purposes and not the LDS Church's published purposes.

11.     The situation with City Creek Center is demonstrative.  Beginning in 2003, Plaintiff and Class Members became aware of suggestions that Defendant

LDS Corporation was using $1.4 billion to purchase and develop a property for a commercial, for-profit purpose, City Creek Center, which contradicted the LDS Church's published purposes for tithing; regardless, Plaintiff and Class Members thereafter relied on the representations of high-ranking LDS Church leaders and employees that tithing funds *were not* being used to purchase or develop the City Creek Center property, and in reliance on those representations, Plaintiff and Class Members continued to pay ten percent (10%) of their incomes as tithing.

12.     Furthermore, Plaintiff and Class Members relied on Defendants as fiduciaries to use their donated tithing funds for charitable, not-for-profit purposes, including distribution to the poor and needy.  Defendants' failure to use donated tithing funds in this fashion meant that Plaintiff and Class Members were unable to fulfill their intentions, in part, for donating tithing funds.  As a result, millions of dollars in charitable donations never reached people in need, as intended by Plaintiff and Class Members.

13.     Plaintiff and Class Members would not have paid ten percent (10%) of their incomes as tithing to Defendants had they known that their contributions would be used for a commercial, for-profit purpose as opposed to the LDS Church's published purposes for tithing, including care for the poor and needy.  Simply stated, tithing that ultimately ends up solely benefitting the recipient in its for-profit ventures is not tithing at all.

14.     Plaintiff's and Class Members' reasons for paying tithes have been frustrated as a result of Defendants' failure to use tithing funds for the LDS Church's published purposes, including care for the poor and needy.

15.     Plaintiff and Class Members are entitled to compensation for tithing paid as gifts to Defendants because, as donors, their intent was induced by fraud. Therefore, Plaintiff's and Class Members' gifts, in the form of tithing, may be rescinded or set aside in an action in equity.

16.     Plaintiff and Class Members' monetary payments to Defendants, in the form of tithing, resulted in Defendants receiving and retaining an unjust benefit which must be disgorged.

## II.     PARTIES

### A.     Plaintiff

17.     Plaintiff Brandall Brawner ("Plaintiff") is a citizen and resident of Gallatin, Sumner County, Tennessee.

18.     From December 1995 to March 2014, Plaintiff was an active member of the LDS Church and paid ten percent (10%) of his income to the LDS Church as tithing.

19.     From April 5, 2003 to October 5, 2012, Plaintiff paid approximately $30,000 in tithing to the LDS Church.

20.    Plaintiff appears in this action individually and on behalf of all others similarly situated (hereinafter "Class Members" or "Class"), and pursuant to Fed. R. Civ. P. 23(a) and (b).

### B.    Defendants

21.    Defendant Corporation of the President of the Church of Jesus Christ of Latter-Day Saints ("LDS Corporation") is a Utah corporation with its principal place of business located at 50 E. North Temple Dr., 2WW, Salt Lake City, Salt Lake County, Utah 84150.

22.     Defendant Ensign Peak Advisors, Inc. ("Ensign," "Ensign Peak," or "EPA") is a Utah not-for-profit corporation with its principal place of business located at 60 E. South Temple St.,  Ste. 400, Salt Lake City, Salt Lake County, Utah 84111.

23.    At all times relevant herein, as detailed more fully *infra*, Defendants were engaged in a civil conspiracy with one another to redirect tithing funds to for-profit ventures and the financial enrichment of the church itself rather than its charitable and religious purposes, and to otherwise effectuate the scheme set forth herein.

24.    All acts and omissions of Defendants as described herein were done by their agents, servants, employees and/or owners, acting in the course and scope of their respective agencies, services, employments and/or ownership.

## III.   JURISDICTION AND VENUE

25.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d), because at least once Class Member is of diverse citizenship from Defendants, there are more than one hundred (100) Class Members, and the aggregate amount in controversy exceeds $5,000,000 exclusive of costs and interest.

26.    This Court has personal jurisdiction over Defendants pursuant to 28 U.S.C. § 1391(a) because Defendants' contacts with the State of Tennessee and this federal judicial district are systematic, continuous, and sufficient to subject them to personal jurisdiction in this Court.  Specifically, Defendants worked in tandem to avail themselves of the privilege of conducting business in the forum state by collecting tithing funds from LDS Church members within the forum state. In addition, Defendants have maintained systematic and continuous business contacts within the forum state, including business contacts with their organizational units consisting of stakes, wards, and branches, and the administrators of its temple in Nashville, Tennessee.

27.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District where Plaintiff resided, received these communications, relied on Defendants' misrepresentations, and paid tithing funds.

## IV.    FACTS COMMON TO ALL COUNTS

8

**A.    Defendant LDS Corporation and its investment division, Defendant Ensign Peak Advisors, have a storied history of intentionally concealing financial information.**

28.    On February 21, 2023, a press release titled, "SEC Charges The Church of Jesus Christ of Latter-day Saints and Its Investment Management Company for Disclosure Failures and Misstated Filings," announced that the U.S. Securities and Exchange Commission ("SEC") had found that Defendant LDS Corporation and its investment division, Defendant Ensign Peak Advisors ("Ensign Peak"), had created thirteen (13) shell LLCs to intentionally conceal Defendant LDS Corporation's investments:[1]

---

[1] *SEC Charges The Church of Jesus Christ of Latter-day Saints and Its Investment Management Company for Disclosure Failures and Misstated Filings*, U.S. Securities and Exchange Commission website, https://www.sec.gov/news/press-release/2023-35 (Last visited Nov. 14, 2023).

The SEC's order finds that, from 1997 through 2019, Ensign Peak failed to file Forms 13F, the forms on which investment managers are required to disclose the value of certain securities they manage. According to the order, the Church was concerned that disclosure of its portfolio, which by 2018 grew to approximately $32 billion, would lead to negative consequences. To obscure the amount of the Church's portfolio, and with the Church's knowledge and approval, Ensign Peak created thirteen shell LLCs, ostensibly with locations throughout the U.S., and filed Forms 13F in the names of these LLCs rather than in Ensign Peak's name. The order finds that Ensign Peak maintained investment discretion over all relevant securities, that it controlled the shell companies, and that it directed nominee "business managers," most of whom were employed by the Church, to sign the Commission filings. The shell LLCs' Forms 13F misstated, among other things, that the LLCs had sole investment and voting discretion over the securities. In reality, the SEC's order finds, Ensign Peak retained control over all investment and voting decisions.

"We allege that the LDS Church's investment manager, with the Church's knowledge, went to great lengths to avoid disclosing the Church's investments, depriving the Commission and the investing public of accurate market information," said Gurbir S. Grewal, Director of the SEC's Division of Enforcement. "The requirement to file timely and accurate information on Forms 13F applies to all institutional investment managers, including non-profit and charitable organizations."

Ensign Peak agreed to settle the SEC's allegation that it violated Section 13(f) of the Securities Exchange Act of 1934 and Rule 13f-1 thereunder by failing to file Forms 13F and for misstating information in these forms. The Church agreed to settle the SEC's allegation that it caused Ensign Peak's violations through its knowledge and approval of Ensign Peak's use of the shell LLCs.

29.     Notably, the press release reported that "[t]he Church agreed to settle the SEC's allegation that it caused Ensign Peak's violations through its knowledge and approval of Ensign Peak's use of the shell LLCs."[2]

30.     In the Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing A Cease-and-Desist Order, the SEC found: [3]

[T]he Church and Ensign Peak created thirteen limited liability corporations ("LLCs"), including twelve similar LLCs (the "Clone LLCs") with

---

[2] *Id.*

[3] *Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing A Cease-and-Desist Order*, p. 2. https://www.sec.gov/files/litigation/admin/2023/34-96951.pdf (Last visited Nov. 14, 2023).

addresses located throughout the U.S., for the sole purpose of filing Forms 13F and preventing public disclosure by Ensign Peak of the Church's equity securities holdings."

31.    The SEC concluded, "Ensign Peak developed its approach to filing Forms 13F in the names of these LLCs *with the knowledge and approval of the Church, which sought to avoid disclosure of the amount and nature of its assets*" (emphasis added).[4]

32.    To settle the charges, Ensign Peak agreed to pay a $4 million penalty and the LDS Church agreed to pay a $1 million penalty.[5]

33.    On February 21, 2023, the LDS Church issued an official statement on the SEC settlement.[6]  In the Frequently Asked Questions section of the statement, the following question and answer appeared:[7]

Q: Did the Church know about the practices at Ensign Peak described in the order?

A: The Church's senior leadership received and relied upon legal counsel when it approved of the use of the external companies to make the filings. Ensign Peak handled the mechanics of the filing process. The Church's senior leadership never prepared or filed the specific reports at issue.

34.    This statement unequivocally confirms that the LDS Church's senior leadership knew about the scheme to intentionally conceal Defendant LDS Corporation's investments.  In addition, the statement reveals the evasive and

---

[4] *Id.*
[5] *Id.* at p. 8.
[6] *Church Issues Statement on SEC Settlement*, LDS Church website, https://newsroom.churchofjesuschrist.org/article/church-issues-statement-on-sec-settlement (Last visited Nov. 14, 2023).
[7] *Id.*

disingenuous position that the LDS Church had taken regarding this proceeding: senior leadership within the LDS Church are sophisticated and experienced business managers who were well aware—with or without legal counsel—that creating thirteen (13) shell companies and filing Forms 13F in the names of these shell companies was a patently dishonest business practice.

35.     The SEC action against the LDS Church and Ensign Peak reveals a pattern of conduct and corporate culture that valued dishonesty and concealment over honesty and transparency.

36.     Like in the aforementioned SEC action, in the present action brought by Plaintiff and Class Members, Defendant LDS Corporation and its investment division, Defendant Ensign Peak, intentionally concealed financial information from LDS Church members and the public through misrepresentations.

**B.     The LDS Church repeatedly represented that tithing funds would be used for its published purposes:  to build and maintain temples and meetinghouses, to sustain missionary work, to educate members, and to care for the poor and needy.**

37.     On its official website, the LDS Church represented and continues  to represent:

> Tithing funds are always used for the Lord's purposes—to build and maintain temples and meetinghouses, to sustain missionary work, to educate Church members, and to carry on the work of the Lord throughout the world.[8]

---

[8] *Tithing*, LDS Church website, https://www.churchofjesuschrist.org/study/manual/gospel-topics/tithing?lang=eng (Last visited Nov. 14, 2023).

38.     On October 5, 2002 during the LDS Church's bi-annual General

Conference, Robert D. Hales, an "apostle", which is one of fifteen (15) top-

ranking leaders who govern the LDS Church, stated:

> All tithing funds are spent for the purposes of the Church, *including*
> *welfare—care for the poor and needy*—temples, buildings and upkeep of
> meetinghouses, education, curriculum—in short, the work of the Lord
> (emphasis added).[9]

39.     Robert D. Hales' aforementioned statement during the October 2002

bi-annual General Conference video broadcast was subsequently published in the

LDS Church's official magazine, *The Ensign*, in November 2002.[10]

40.     In video broadcasts and print publications, the LDS Church

represented to Plaintiff and Class Members that their tithing funds would be used

solely for these published purposes:  to build and maintain temples and

meetinghouses, to sustain missionary work, to educate members, and to care for

the poor and needy.

41.     Never at any time in video broadcasts and print publications did the

LDS Church represent to Plaintiff and Class Members that their tithing funds

---

[9] Robert D. Hales, *Tithing a Test of Faith with Eternal Blessings*, October 2002 bi-annual
General Conference, https://www.churchofjesuschrist.org/study/general-
conference/2002/10/tithing-a-test-of-faith-with-eternal-blessings?lang=eng (Last visited Nov. 14,
2023).
[10] Robert D. Hales, *Tithing a Test of Faith with Eternal Blessings*, The Ensign*,* November 2002,
https://www.churchofjesuschrist.org/study/ensign/2002/11/tithing-a-test-of-faith-with-eternal-
blessings?lang=eng (Last visited Nov. 14, 2023).

would be used for commercial, for-profit purposes.

42.     Plaintiff and Class Members paid tithing in reliance on the LDS Church's representations that these funds would be used for its published purposes:  to build and maintain temples and meetinghouses, to sustain missionary work, to educate members, and to care for the poor and needy.

**C.     The LDS Church repeatedly represented in video broadcasts and print publications that tithing funds *would not* be used for commercial, for-profit purposes including the financing of City Creek Center.**

43.     On April 5, 2003, Gordon B. Hinckley, then acting president of the LDS Church and member of Defendant LDS Corporation, made the following statement during a bi-annual General Conference video broadcast:

> I call attention to that which has received much notice in the local press. This is our decision to purchase the shopping mall property immediately to the south of Temple Square.
>
> *               *               *
>
> But I wish to give the entire Church the assurance that tithing funds have not and will not be used to acquire this property.  Nor will they be used in developing it for commercial purposes.  Funds for this have come and will come from those commercial entities owned by the Church.  These resources, together with the earnings of invested reserve funds, will accommodate this program.[11]

44.     Gordon B. Hinckley's aforementioned statement during the April

---

[11] Gordon B. Hinckley, *The Condition of the Church*, Apr. 5, 2003, bi-annual General Conference, https://www.churchofjesuschrist.org/study/general-conference/2003/04/the-condition-of-the-church?lang=eng (Last visited Nov. 14, 2023).

2003 bi-annual General Conference video broadcast was subsequently published in the LDS Church's official magazine, *The Ensign*, in May 2003.[12]

45.     In a press conference on October 8, 2003, H. David Burton, then Presiding Bishop of the LDS Church and member of Defendant LDS Corporation, made similar representations regarding financing for the development of City Creek Center, stating "[n]one of this money comes from the tithing of our faithful members…That is not how we use tithing funds."[13]

46.     In December 2003, the LDS Church's official magazine, *The Ensign*, published an article reiterating the same representation:

> The Church first announced three years ago it was planning to redevelop the downtown area to energize the economy of the city that houses its headquarters and to bolster the area near Temple Square.  No tithing funds will be used in the redevelopment.[14]

47.     On March 27, 2007, *Deseret News*, a Salt Lake City newspaper owned by Defendant LDS Corporation, published an article stating:

> Church officials have not said how much they expect the entire development to cost, though city officials and others have estimated it could be an investment of $1 billion or more.

---

[12] Gordon B. Hinckley, *The Condition of the Church*, The Ensign, May 2003, https://media.ldscdn.org/pdf/magazines/ensign-may-2003/2003-05-00-ensign-eng.pdf?lang=eng (Last visited Nov. 14, 2023).

[13] Lisa Ann Jackson, *Church to Move Campuses, Invest in Salt Lake City Redevelopment*, The Ensign, December 2003, https://www.churchofjesuschrist.org/study/ensign/2003/12/news-of-the-church/church-to-move-campuses-invest-in-salt-lake-city-redevelopment?lang=eng (Last visited Nov. 14, 2023).

[14] *Church Releases Plans for Downtown Salt Lake*, The Ensign, December 2006, https://www.churchofjesuschrist.org/study/ensign/2006/12/news-of-the-church/church-releases-plans-for-downtown-salt-lake?lang=eng (Last visited Nov. 14, 2023).

Money for the project is not coming from LDS Church members' tithing donations.  City Creek Center is being developed by Property Reserve Inc., the church's real-estate development arm, and its money comes from other real-estate ventures.[15]

48.     On October 5, 2012, Keith B. McMullin, formerly the second counselor in the LDS Church's Presiding Bishopric and a former member of Defendant LDS Corporation, who at relevant times headed Deseret Management Corp., a company owned by Defendant LDS Corporation, represented in an interview for *The Salt Lake Tribune* newspaper that tithing funds had not, and would not, be used for commercial purposes including City Creek Center: "McMullin said not one penny of tithing goes to the Church's for-profit endeavors.  Specifically, the Church has said no tithing went toward City Creek Center."[16]

49.     In summary, from 2003 to 2012, high-ranking leaders of the LDS Church—who were also members or former members of Defendant LDS Corporation—repeatedly represented in video broadcasts and print publications that tithing funds *would not* be used for commercial, for-profit purposes, including

---

[15] Doug Smeath, *Downtown renovation project*, Deseret News, Mar. 27, 2007, https://www.deseret.com/2007/3/27/20785879/downtown-renovation-project (Last visited Nov. 14, 2023).

[16] Caroline Winter, et al., *The Money behind the Mormon message*, Salt Lake City Tribune, Oct. 5, 2012 https://archive.sltrib.com/article.php?id=54478720&itype=cmsid (Last visited Nov. 14, 2023).

City Creek Center.

### D. An IRS Whistleblower Complaint revealed that $1.4 billion in never-invested tithing funds were used to finance City Creek Center.

50.     In December 2019, David Nielsen, a senior portfolio manager for Defendant Ensign Peak Advisors ("Ensign Peak" or "EPA"), Defendant LDS Corporation's investment division, filed an IRS Whistleblower Complaint alleging that Defendants used $1.4 billion in tithing funds to finance City Creek Center, a commercial, for-profit shopping mall, and that Defendants should lose any tax exempt status because the money was not used for charitable purposes.[17]

51.     In his Complaint, David Nielsen stated that EPA cut checks for $1.4 billion between 2010 to 2014 to cover construction costs for City Creek Center, noting that "EPA paid $1.4 billion exclusively using tithing dollars on a for-profit mall":[18]

The second unplanned outflow was a series of payments between 2010 and 2014. EPA paid $1.4 billion (**Exhibit D**) to shore up cost over-runs (also on the heels of the financial crisis) in the construction of the opulent City Creek Mall[16]—with an award-winning retractable roof,[17] luxury storefronts, and a fish-filled river. Raising capital from the usual sources of project finance would have been untenable.[g] From 2010 to 2014, if EPA were honest in its dealings and comparable to peer foundations, it should have spent at least $9.8 billion on its exempt purpose. EPA paid $1.4 billion exclusively using tithing dollars[h] on a for-profit mall. Is the religious, educational, or charitable activity of the mall >95% per IRS requirements? No.[18]

---

[17] David Nielsen, *Letter to an IRS Director*, http://openargs.com/wp-content/uploads/IRS-Letter-Final.pdf (Last visited Nov. 14, 2023).
[18] *Id.* at p. 7.

52.     David Nielsen further stated that "[t]hese checks were cut from the
EPA treasury account, not from any liquidation of allocated capital.  Only never-
invested tithing surplus enters the EPA Treasury account":[19]

> ʰ These checks were cut from the EPA Treasury account, not from any liquidation of
> allocated capital. Only never-invested tithing surplus enters the EPA Treasury
> account. The COP-owned Ensign Magazine published in 2006 referring to the City
> Creek Mall: "No tithing funds will be used in the redevelopment."⁵⁶

53.     David Nielsen explained the reasoning behind Defendants' use of
tithing funds to finance City Creek Center:[20]

> ᵍ All capital has a cost, except when it doesn't. 100% of EPA's capital comes from
> tithing in excess of the church's operating budget together with returns from
> investing that tithing. Rather than raise money from capital markets, at a cost of
> equity, or from banks, at a cost of debt, they raised it from tithing. So, the project's
> cost of capital was zero. It may never have been economically viable without that free
> capital.

54.     David Neilsen further stated that EPA—as the investment arm of
Defendant LDS Corporation—had not returned any funds to the LDS Church for
religious, educational, or charitable purposes in twenty-two (22) years.[21]  In short,
EPA "is the reserves of reserves" of Defendant LDS Corporation; Defendant LDS
Corporation "does not draw down on it, and it has no mission—no liability stream,

---

[19] *Id.* at p. 7 and footnote h.  Note that the acronym "COP" stands for "Corporation of the
President" and refers to Defendant LDS Corporation.
[20] *Id.* at p. 7, footnote g.
[21] *Id.* at pp. 2, 3, 8 and 28 footnote jjj.

no schedule of activities, no plans for use, and no efforts to even model the future."[22]

55.     The IRS Whistleblower Complaint included EPA's Articles of Incorporation as an exhibit, which stated, "[EPA's] property is irrevocably dedicated to religious, educational, and charitable purposes meeting the requirements for exemption provided by Section 501c3 of the Internal Revenue Code."[23]

56.     Whether LDS Corporation and EPA violated Section 501c3 is a question for the IRS which will not be addressed in this action; however, Defendant EPA, under the direction of Defendant LDS Corporation, allegedly violated Defendant EPA's published Articles of Incorporation which sets forth that property would be used solely for "religious, educational, and charitable purposes."[24]

**E.    Defendants, through their agents, intentionally misrepresented financial information to ensure that Plaintiff and the Class continued to pay tithes to finance the Church's for-profit, commercial enterprises and in spite of Defendants having amassed a $100 billion fund.**

57.     Defendant LDS Corporation is comprised of the First Presidency of the LDS Church, a governing body which includes the president or "prophet" of

---

[22] *Id.* at p. 6.
[23] *Id.* at p. 45, Exhibit E.1.
[24] *Id.*

the LDS Church and the two most senior "apostles," along with the Presiding Bishopric, which is comprised of three senior leaders entrusted with managing the finances and physical facilities of the LDS Church.[25]

58.     As set forth above, on April 5, 2003, Gordon B. Hinckley, then acting president and "prophet" of the LDS Church, represented that "tithing funds have not and will not be used to acquire this property.  Nor will they be used in developing it for commercial purposes" regarding the City Creek Center property.[26]

59.     At the time of this statement, Gordon B. Hinckley was a member of Defendant LDS Corporation.

60.     As set forth above, on October 8, 2003, H. David Burton, then Presiding Bishop of the LDS Church, stated that "[n]one of this money comes from the tithing of our faithful members…That is not how we use tithing funds" regarding the financing for City Creek Center.[27]

61.     At the time of this statement, H. David Burton was a member of Defendant LDS Corporation.

---

[25] *Id.* at p. 53, Exhibit I.

[26] Gordon B. Hinckley, *The Condition of the Church*, Apr. 5, 2003, bi-annual General Conference, https://www.churchofjesuschrist.org/study/general-conference/2003/04/the-condition-of-the-church?lang=eng (Last visited Nov. 14, 2023).

[27] Lisa Ann Jackson, *Church to Move Campuses, Invest in Salt Lake City Redevelopment*, The Ensign, December 2003, https://www.churchofjesuschrist.org/study/ensign/2003/12/news-of-the-church/church-to-move-campuses-invest-in-salt-lake-city-redevelopment?lang=eng (Last visited Nov. 14, 2023).

62.     As set forth above, in December 2003, the LDS Church's official magazine, *The Ensign*, published an article reiterating that "[n]o tithing funds will be used in the redevelopment" of City Creek Center.[28]

63.     As set forth above, on March 27, 2007, *Deseret News*, a Salt Lake City newspaper owned by Defendant LDS Corporation, published an article stating, "[m]oney for the project is not coming from LDS Church members' tithing donations.  City Creek Center is being developed by Property Reserve Inc., the church's real-estate development arm, and its money comes from other real-estate ventures."[29]

64.     As set forth above, on October 5, 2012, Keith B. McMullin, formerly the second counselor in the LDS Church's Presiding Bishopric, was quoted in the *The Salt Lake Tribune* newspaper:  "McMullin said not one penny of tithing goes to the Church's for-profit endeavors.  Specifically, the Church has said no tithing went toward City Creek Center."[30]

---

[28] *Church Releases Plans for Downtown Salt Lake*, The Ensign, December 2006, https://www.churchofjesuschrist.org/study/ensign/2006/12/news-of-the-church/church-releases-plans-for-downtown-salt-lake?lang=eng (Last visited Nov. 14, 2023).

[29] Doug Smeath, *Downtown renovation project*, Deseret News, Mar. 27, 2007, https://www.deseret.com/2007/3/27/20785879/downtown-renovation-project (Last visited Nov. 14, 2023).

[30] Caroline Winter, et al., *The Money behind the Mormon message*, Salt Lake City Tribune, Oct. 5, 2012, https://archive.sltrib.com/article.php?id=54478720&itype=cmsid (Last visited Nov. 14, 2023).

65.     At the time of this statement, Keith B. McMullin was a former member of Defendant LDS Corporation.  Critically, Defendant LDS Corporation had already made payments drawn from the EPA treasury account containing never-invested tithing funds when this statement was made.[31]

66.     The intent behind the aforementioned misrepresentations by Defendant LDS Corporation's agents was subsequently revealed by the head of EPA, Roger Clarke, in an interview published on February 8, 2020, in the *The Wall Street Journal*.  In that interview, Roger Clarke reportedly said, "[w]e've tried to be somewhat anonymous" regarding the LDS Church's investments.[32]

67.     Roger Clarke further stated that the reason the LDS Church kept silent on its $100 billion dollar fund was "[s]o they never wanted to be in a position where people felt like, you know, they shouldn't make a contribution."[33]

**F.     A Central District of California case alleges similar facts and legal theories and incorporates a sworn statement by David Nielsen that further evidences Defendants' misrepresentations.**

68.     On March 22, 2021, California resident James Huntsman filed *James Huntsman v. Corporation of the President of the Church of Jesus Christ of Latter-*

---

[31] David Nielsen, *Letter to an IRS Director,* at p. 8, http://openargs.com/wp-content/uploads/IRS-Letter-Final.pdf (Last visited Nov. 14, 2023).

[32] Ian Lovett and Rachael Levy, *The Mormon Church Amassed $100 Billion.  It Was the Best-Kept Secret in the Investment World*, The Wall Street Journal, Feb. 8, 2020, https://www.wsj.com/articles/the-mormon-church-amassed-100-billion-it-was-the-best-kept-secret-in-the-investment-world-11581138011 (Last visited Nov. 14, 2023).

[33] *Id.*

*Day Saints*, case no. 21-cv-02504 ("the *Huntsman* case") in the Central District of California alleging similar facts and legal theories as alleged in the present action.[34]

69.     James Huntsman is the son of the late businessman and LDS Church leader Jon Huntsman Sr. and brother of former Utah governor and U.S. presidential candidate Jon Huntsman Jr.—a family sometimes called the "Mormon Kennedys."[35]

70.     The *Huntsman* case is not a putative class action, but an action where an individual plaintiff is demanding a minimum refund of $5 million in tithing funds based on the facts revealed in David Nielsen's IRS Whistleblower Complaint.[36]

71.     In response to Defendant LDS Corporation's Motion for Summary Judgment, Plaintiff James Huntsman incorporated a sworn declaration by David Nielsen, wherein Nielsen set forth additional facts evidencing Defendant LDS Corporation's use of tithing funds to finance City Creek Center and Defendant

---

[34] *Huntsman v. Corporation of the President of the Church of Jesus Christ of Latter-Day Saints*, case no. 21-cv-02504, Complaint, [Doc. 1].
[35] Michelle Boorstein, *He was Mormon royalty. Now his lawsuit against the church is a rallying cry*, Washington Post, Sept. 9, 2023, https://www.washingtonpost.com/religion/2023/09/09/he-was-mormon-royalty-now-his-lawsuit-against-church-is-rallying-cry/?=undefined (Last visited Nov. 14, 2023).
[36] *Huntsman*, Complaint, [Doc. 1].

LDS Corporation's deceptive intention to withhold this fact from the members of the LDS Church:[37]

8.      Based on statements made by EPA senior leadership including in the meeting described below, over a five-year period, the Council approved EPA's withdrawal of approximately $1.4 billion in tithing funds to pay for the commercial development of the City Creek Mall.   The Council likewise approved EPA's withdrawal of $600 million in tithing funds to bail out a company called Beneficial Life Insurance Company.

9.      In March 2013, I attended a meeting led by EPA senior leadership. EPA's President Roger Clarke, along with Robert Nydegger, gave a presentation in which they described, among other things, the various ways that EPA had been distributing and/or withdrawing its tithing funds, including in connection with the City Creek Mall and Beneficial Life Insurance Company.  Mr. Clarke used a presentation that included what is attached as Exhibit "A," a true and correct copy of a slide from that presentation titled "Ensign Peak & Portfolio Purposes."   This slide presented by Mr. Clarke includes, among other things, "Examples of withdrawals" that include:

"City Creek: $1,400mm over 5 years"

"Beneficial Life: $600mm in 2009"

72.      An image of Exhibit A appears below:[38]

---

[37] *Huntsman*, Declaration of David A. Nielsen in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, ¶¶8-9 [Doc. 37].
[38] *Id.* at Exhibit A.

## Ensign Peak & Portfolio Purposes

**The Role of Ensign Peak Advisors**

- Balance wealth growth and preservation of principal
- Maintain adequate liquidity for Church operations & investment flexibility
- Add incremental return through active management
- Maintain cost-effective & secure operations
- Produce accurate & timely reports
- Provide investment alternatives and education to affiliated entities & presiding councils
- Comply with appropriate legal & regulatory conditions
- Avoid investments or activities that would detract from the mission of the Church

**Purpose of the investment reserve is to support the following:**

- Prophetic initiatives
- Budget supplement
- Backstop the pension plan
- Backstop the taxable entities
- Collateral for Church purposes

**Examples of withdrawals are\*:**

- Conference Center: $0mm; funded out of budget
- Proliferation of temples: $0; funded out of budget
- City Creek: $1,400mm over 5 years
- Beneficial Life: $600mm in 2009
- Pension / Other: $0mm; underfunded
- Collateral: ~$200mm for church entities

\* *The draw on the investment reserves has been relatively small due to the conservative nature of Church finances and operations – i.e. a balanced budget. This is a very strong first line of defense. Furthermore, over the past several years, approximately $1bn has been granted to EPA on an annual basis.*

73.    In paragraph 10 of his sworn declaration, David Nielsen stated that he "asked how the Church's public statements about no tithing funds being used for City Creek Mall or Beneficial Life could be consistent with Mr. Clarke's description of how EPA had made 'withdrawals' for 'City Creek: $1,400 mm over 5 years' and 'Beneficial Life: $600mm in 2009'".[39]  Roger Clarke, head of EPA, "responded that two other Church-affiliated entities (Property Reserve, Inc. and Deseret Management Corporation) had received from EPA the $1.4 billion and

---

[39] *Id.* at ¶10.

$600 million, respectively, paid by EPA for City Creek Mall and Beneficial Life":[40]

> 10.    Before this March 2013 meeting led by EPA's President Roger Clarke described above, I and other employees of EPA with whom I spoke were aware of public statements by the Church that no tithing funds would be used for City Creek Mall or other for-profit businesses.  When Mr. Clarke made the presentation described above using Exhibit A, I and possibly other EPA employees present asked how the Church's public statements about no tithing funds being used for City Creek Mall or Beneficial Life could be consistent with Mr. Clarke's description of how EPA had made "withdrawals" for "City Creek: $1,400mm over 5 years" and "Beneficial Life: $600mm in 2009."  Mr. Clarke responded that two other Church-affiliated entities (Property Reserve, Inc. and Deseret Management Corporation) had received from EPA the $1.4 billion and $600 million, respectively, paid by EPA for City Creek Mall and Beneficial Life, and essentially that, as a result, people would not know EPA was the source of this funding to City Creek Mall and Beneficial Life. Mr. Clarke stated that it was important that people should not know EPA's role as the source of the funds.

74.    Notably, in the last sentence of paragraph 10, David Nielsen stated that Roger Clarke made clear that Defendants' intentions were to conceal that EPA was the source of the funds:  "Mr. Clarke stated that it was important that people should not know EPA's role as the source of the funds."[41]

75.    The transfer of $1.4 billion of never-invested tithing funds from the EPA treasury account to Property Reserve, Inc. and Deseret Management

---

[40] *Id.*
[41] *Id.*

Corporation was nothing more than a shell game to hide from the public and LDS Church members the source of the funds for the purchase and development of the City Creek Center property.

76.    Defendant EPA's funding of these projects explicitly contradicted statements of high-ranking LDS Church leaders, including the president of the LDS Church, that the funds were coming from other entities owned by Defendant LDS Corporation.[42]

77.    David Nielsen concluded his sworn statement by declaring that "all of EPA's funds were tithing funds and were treated by EPA as tithing funds:"[43]

---

[42] Gordon B. Hinckley, *The Condition of the Church*, Apr. 5, 2003, bi-annual General Conference, https://www.churchofjesuschrist.org/study/general-conference/2003/04/the-condition-of-the-church?lang=eng (Last visited Nov. 14, 2023); *see also* Doug Smeath, *Downtown renovation project*, Deseret News, Mar. 27, 2007, https://www.deseret.com/2007/3/27/20785879/downtown-renovation-project (Last visited Nov. 14, 2023).
[43] *Huntsman*, Declaration of David A. Nielsen in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, ¶11 [Doc. 37].

11.     After that March 2013 meeting described above, Mr. Clarke's presentation and the statements on Exhibit A prompted additional discussions among EPA personnel of whether EPA's funding of City Creek Mall and Beneficial Life with approximately $2 billion in EPA tithing funds could somehow be reconciled with the Church's public statements that no tithing funds were used for City Creek Mall or Beneficial Life.  Again, all of EPA's funds were tithing funds and were treated by EPA as tithing funds; every penny was "the widow's mite."  Based on Mr. Clarke's statements described above of which I have personal knowledge, it appeared the Church's public statements were intended to conceal the truth about EPA's use of tithing funds for City Creek Mall and Beneficial Life.

## G.     Defendants' fraud induced Plaintiff and Class Members to continue paying tithes and frustrated Plaintiff's and Class Members' reasons for paying tithes.

78.     Plaintiff Brandall Brawner ("Plaintiff") was an active member of the LDS Church from December 1995 to March 2014.

79.     During this time, Plaintiff watched all video broadcasts of the LDS Church's bi-annual General Conference at his local meetinghouse and read the LDS Church's official magazine, *The Ensign*.

80.     From 1995 to 1998, Plaintiff lived in Provo, Utah and American Fork, Utah.

81.     From 1998 to 2010, Plaintiff lived in Tennessee.

82.      From 2010 to 2013, Plaintiff lived in Orem, Utah then moved back to Tennessee in 2013 where he now resides.

83.     While living in Tennessee, Plaintiff became aware of Defendant LDS Corporation's development of City Creek Center beginning in 2003 from high-ranking LDS Church leaders—who were also members of Defendant LDS Corporation—in the LDS Church's bi-annual General Conference and the LDS Church's official magazine, *The Ensign*.

84.     Plaintiff was surprised that Defendant LDS Corporation was developing a commercial, for-profit shopping mall because this contradicted the LDS Church's published purposes for tithing; however, Plaintiff was reassured by the repeated representations by high-ranking LDS Church leaders—who were also members of Defendant LDS Corporation—that no tithing funds would be used to purchase or develop the City Creek Center property and Plaintiff subsequently relied on those representations when paying his tithing.

85.     From 2003 to 2012, Plaintiff continued to watch the LDS Church's bi-annual General Conference video broadcasts at his local meetinghouse and read the LDS Church's official magazine, *The Ensign*.

86.     Plaintiff continued to rely on representations made by high-ranking LDS Church leaders in print publications and video broadcasts that tithing funds would *only* be used for the LDS Church's published purposes:  to educate its members, conduct missionary work, build and maintain meetinghouses and temples, and perform charitable work including care for the poor and needy.

87.     Plaintiff continued to rely on representations made by high-ranking LDS Church leaders in print publications and video broadcasts that tithing funds would *not* be used for commercial, for-profit purposes, including the financing of City Creek Center.

88.     The misrepresentations made by Defendants through their agents and employees—including the president of the LDS Church or "prophet" and other high-ranking LDS Church leaders who were also members of Defendant LDS Corporation—that tithing funds *would not* be used for City Creek Center and other commercial, for-profit purposes were false, intentional, and made to induce Plaintiff and Class Members to pay tithing funds in spite of Defendants having amassed over $100 billion in assets.

89.     Plaintiff and Class Members would not have paid ten percent (10%) of their income as tithing had they known that their contributions would be used for a commercial, for-profit purpose as opposed to the LDS Church's published purposes for tithing funds:  to educate its members, conduct missionary work, build and maintain meetinghouses and temples, and perform charitable work including care for the poor and needy.

90.     Plaintiff and Class Members are entitled to compensation for tithing funds paid as gifts to Defendants because, as donors, their intent was induced by fraud.

91.   Plaintiff's and Class Members' gifts, in the form of tithing funds must be rescinded.

92.   Importantly, Plaintiff and Class Members relied on Defendants as fiduciaries to distribute their donated tithing funds to the poor and needy.

93.   Defendants' failure to distribute donated tithing funds to the poor and needy meant that Plaintiff and Class Members were unable to fulfill their intentions, in part, for donating tithing funds.  As a result, millions of dollars in charitable donations never reached people in need.

94.   Plaintiff's and Class Members' reasons for membership in Defendant LDS Corporation's organization have been frustrated as a result of Defendants' failure to use tithing funds for the LDS Church's published purposes, including care for the poor and needy.

95.   Plaintiff's and Class Members' payment of tithing has resulted in Defendants receiving and retaining an unjust benefit which must be disgorged.

**H.    Plaintiff discovers Defendants' fraud**

96.   On May 14, 2023, the iconic CBS News program *60 Minutes* aired an interview with IRS Whistleblower David Nielsen titled, "Mormon Whistleblower:

Church's Investment Firm Masquerades as Charity", wherein he discussed the facts set forth in the aforementioned IRS Whistleblower Complaint.[44]

97.   In or around October 2023, Plaintiff spoke with a close friend from high school who was also a former member of the LDS Church who encouraged Plaintiff to watch the *60 Minutes* interview with David Nielsen on YouTube[45].

98.   Plaintiff subsequently watched the *60 Minutes* interview with David Nielsen and learned the specific details comprising the fraudulent scheme perpetuated by Defendants, on which Plaintiff had relied when paying over $30,000 in tithing.

## V.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.   Discovery Rule Tolling

99.   Plaintiff and Class Members could not have discovered through reasonable diligence that Defendants had used tithing funds for a commercial, for-profit purpose—the financing of City Creek Center—which was contrary to Defendant LDS Corporation's representations, within the time period of any applicable statutes of limitation.

100.   Plaintiff and Class Members did not know, and could not have reasonably known, of Defendants' fraud until in or around May 14, 2023 when *60*

---

[44] *Mormon whistleblower: Church's investment firm masquerades as charity,* 60 Minutes, May 14, 2023, https://www.youtube.com/watch?v=k3_Fhq7sEHo&t=6s (Last visited Nov. 14, 2023).
[45] *Id.*

*Minutes*, a nationally broadcasted and well-known news program, aired the interview with IRS Whistleblower David Nielsen.  Therefore, Plaintiff's claims and the claims of all Class Members did not accrue until they discovered that Defendants had used tithing funds for a commercial, for-profit purpose—to finance City Creek Center—contrary to Defendant LDS Corporation's repeated representations and the LDS Church's published purposes.

### B.    Fraudulent Concealment Tolling

101.   Throughout the time period relevant to this action, Defendants concealed from and failed to disclose to Plaintiff and the other Class Members Defendants' use of $1.4 billion in tithing funds for a commercial, for-profit purpose—the financing of City Creek Center.  Defendants kept Plaintiff and the other Class members ignorant of vital information essential to the pursuit of their claims, and as a result, neither Plaintiff nor the other Class members could have discovered Defendants' fraud, even upon reasonable exercise of diligence.

102.   Prior to the date of this Complaint, Defendants knew they had used tithing funds to support non-charitable, profit-generating endeavors—including $1.4 billion in tithing funds to finance City Creek Center while representing to Plaintiff and Class Members it had not—but made no effort to reveal this information.  In doing so, Defendants concealed from or failed to notify Plaintiff

33

and the other Class members about the improper use of tithes, including but not limited to the use of $1.4 billion in tithing funds to finance City Creek Center.

103.   Plaintiff and the other Class Members justifiably relied on Defendants to disclose that they had used $1.4 billion in tithing funds for a commercial, for-profit purpose, as such facts were hidden and not discoverable through reasonable efforts by Plaintiff and the other Class Members.

104.   Thus, the running of all applicable statutes of limitation have been tolled and suspended with respect to any claims that the Plaintiff and the other Class Members have sustained as a result of Defendants' fraud by virtue of the fraudulent concealment doctrine.

**C.     Estoppel**

105.   Defendants were under a continuous duty to disclose to Plaintiff and the other Class Members that they had used tithing funds, for a commercial, for-profit purpose— including $1.4 billion for the financing of City Creek Center— contrary to Defendant LDS Corporation's representations and the LDS Church's published purposes.  Defendants actively concealed this fact, and Plaintiff and the other Class Members reasonably relied upon Defendants' knowing and active concealment of these facts.  Defendants are accordingly estopped from relying on any statute of limitations in defense of this action.  For these same reasons,

Defendants are estopped from relying upon *any* limitations in defense of this action.

## VI.   CLASS ACTION ALLEGATIONS

106.   Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action on behalf of himself and on behalf of a Nationwide Class, defined as:

### Nationwide Class

> All persons within the United States (including its Territories and the District of Columbia) who paid tithing to the LDS Church from a time to be determined but no later than April 5, 2003 through the present.

107.   In the alternative to the Nationwide Class, and pursuant to Fed. R. Civ. P. 23(5), Plaintiff seeks to represent the following State Class as well as any subclasses or issue classes as Plaintiff may propose and/or the Court may designate at the time of class certification:

### Tennessee Class

> All persons and entities within the State of Tennessee who paid tithing to the LDS Church from a time to be determined but no later than April 5, 2003 through the present.

108.   Excluded from all classes are Defendants, as well as Defendants' employees, affiliates, officers, and directors, and the judge and court staff to whom this case is assigned.

109.   Plaintiff reserves the right to modify and/or add to the Nationwide Class and/or State Class prior to class certification.

**A.     Fed. R. Civ. P. 23(a) Prerequisites**

110.   **Numerosity.**  Both the Nationwide Class and State Class are so numerous that joinder of all members is impracticable.  Although the precise number of Class Members is unknown and is within the exclusive control of Defendants, upon information and belief, Defendants' wrongful conduct as set forth above was directed at millions of Class Members in the United States, including tens of thousands in the State of Tennessee.

111.   **Commonality.**  The claims of Plaintiff and the Nationwide Class and State Class involve common questions of fact and law that will predominate over any individual issues.  These common questions include, but are not limited to:

a.     Whether Defendant LDS Corporation represented to Plaintiff and the Class that tithing funds were only used for the LDS Church's published purposes;

b.     Whether Defendant LDS Corporation represented to Plaintiff and the Class that tithing funds *would not* be used for any commercial, for-profit purpose including the financing of City Creek Center;

c.     Whether Defendants knew or should have known that representations to Plaintiff and the Class that tithing funds would only used

for the LDS Church's published purposes were false at the time these representations were made;

d.      Whether Defendants knew or should have known that representations to Plaintiff and the Class that tithing funds *would not* be used for a commercial, for-profit purpose— including the financing of City Creek Center—were false at the time the representations were made;

e.      Whether Defendant LDS Corporation's representations constitute material facts that reasonable Class Members would have considered in deciding to pay tithing;

f.      Whether Defendants used tithing funds for commercial, for-profit purposes, including the financing of City Creek Center;

g.      Whether the funds to finance City Creek Center were drawn from EPA's accounts containing uninvested tithing funds and/or tithing funds comingled with earnings from principal;

h.      Whether $1.4 billion of never-invested tithing funds, or tithing funds comingled with earnings from principal, were transferred from EPA to Property Reserve, Inc. and/or Deseret Management Corporation;

i.      Whether this transfer of $1.4 billion of never-invested tithing funds, or tithing funds comingled with earnings from principal, from EPA to

Property Reserve, Inc. and/or Deseret Management Corporation was deliberately concealed from Plaintiff and the Class;

j.      Whether Defendant LDS Corporation's representations that tithing funds *would not* be used for a commercial, for-profit purpose, including the financing of City Creek Center, were made to intentionally deceive Plaintiff and the Class resulting in continued tithing donations to Defendants;

k.      Whether Defendants' conduct violates Tennessee consumer protection statutes and other laws as asserted herein;

l.      Whether Plaintiff and the Class are entitled to equitable relief, including but not limited to, restitution; and

m.      Whether Plaintiff and the Class are entitled to damages and other monetary relief and, if so, in what amount.

112.    **Typicality.**  Plaintiff's claims are typical of a Nationwide Class or State Class members' claims.  As described herein, Plaintiff and the Class paid ten percent (10%) of their incomes, known as tithing, based in part on Defendant LDS Corporations' representations that tithing funds would be used for the LDS Church's published purposes, which were and are to build and maintain temples and meetinghouses, to sustain missionary work, to educate members, and to perform charitable work including care for the poor and needy, and that tithing

funds *would not* be used for commercial, for-profit purposes, including the financing of City Creek Center.

113.   Plaintiff and Class Members have incurred similar losses based on the same legal theories, and the factual basis for Defendants' wrongful conduct is common to all class members and is representative of wrongful conduct resulting in harm common to all Nationwide Class or State Class Members.

114.   **Adequacy.**  Plaintiff will fully and adequately represent and protect the interests of the Nationwide Class or State Class because he shares common interests with Class Members as a result of Defendants' wrongful conduct.

115.   Plaintiff has retained counsel with experience in complex, commercial, multi-party, mass tort, and class action litigation.  Plaintiff's counsel have prosecuted class actions previously in state and federal courts.

**B.**   **Fed. R. Civ. P. 23(b) Requirements**

116.   Defendants have acted or refused to act on grounds generally applicable to all the members of the Class, thereby making final injunctive relief or declaratory relief concerning the Class as a whole appropriate.

117.   **Predominance.**  Questions of law and fact common to the Nationwide Class or State Class predominate over questions affecting individual members.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Individual damages on the matter can be

readily calculated from records maintained by the Defendants.  Therefore, the questions of individual damages will not predominate over legal and factual questions common to the Nationwide Class or State Class.

118.  **Superiority.**  Defendants' wrongful conduct treated LDS members as a class to be uniformly deceived.  A class action is thus superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff and Class Members have suffered economic harm as a result of Defendants' unlawful and wrongful conduct, which was directed toward Class Members as a whole rather than specifically or uniquely against any individual Class Members.  While individual damages in this case are not insubstantial, there are still significant economies of scale that can be realized by handling this case on a class wide basis, inuring to the benefit of all Class Members and maximizing their recoveries. Furthermore, piecemeal litigation of these individual claims in different courts around the country raises the possibility of inconsistent outcomes.

119.  **Declaratory and Equitable Relief.**  Class wide declaratory and equitable relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Defendants have acted on grounds that apply generally to the Class, and inconsistent adjudications with respect to Defendants' liability would establish incompatible standards and substantially impair or impede the ability of Class Members to protect their interests.  Class wide relief and Court supervision under

Rule 23 assures fair, consistent, and equitable treatment and protection of all Class Members, and uniformity and consistency in Defendants' discharge of their duties to perform corrective action.

## VII.   CAUSES OF ACTION

### COUNT I
### (Fraudulent Misrepresentation on behalf of the Nationwide Class or State Class)

120.   Plaintiff incorporates by reference all material facts in this Complaint as if fully set forth herein.

121.   Plaintiff brings this Count on behalf of himself and the Nationwide Class or Statewide Class.

122.   As alleged above in ¶¶28-98, Defendant LDS Corporation made false statements of material fact that tithing funds would *only* be used for the LDS Church's published purposes and *would not* be used for a commercial, for-profit purpose—the financing of City Creek Center.

123.   Plaintiff and the Class have pleaded their claim of fraudulent misrepresentation with specificity in ¶¶28-98 pursuant to Rule 9(b).

124.   Defendant LDS Corporation made misrepresentations of material fact to Plaintiff and the Class that tithing funds *would not* be used for commercial, for-profit purposes including the financing of City Creek Center in video broadcasts and print publications:

41

a.  on April 5, 2003, Gordon B. Hinckley, then acting president of the LDS Church and member of Defendant LDS Corporation, stated during the LDS Church's video-broadcasted bi-annual April 2003 General Conference that tithing funds *would not* be used to acquire the property or develop City Creek Center and that the funds for financing City Creek Center would come from "commercial entities":

> But I wish to give the entire Church the assurance that tithing funds have not and will not be used to acquire this property.  Nor will they be used in developing it for commercial purposes.  Funds for this have come and will come from those commercial entities owned by the Church.  These resources, together with the earnings of invested reserve funds, will accommodate this program.

b.  in May 2003, Gordon B. Hinckley's aforementioned statement made on April 5, 2003 during the April 2003 bi-annual General Conference video broadcast was published in the LDS Church's official magazine, *The Ensign*;

c.  in a press conference on October 8, 2003, H. David Burton, then Presiding Bishop of the LDS Church and member of Defendant LDS Corporation, stated in regard to the financing of City Creek Center, "[n]one of this money comes from the tithing of our faithful members…That is not how we use tithing funds";

d.      in December 2003, the LDS Church's official magazine, *The Ensign*, published an article on City Creek Center, stating, "[n]o tithing funds will be used in the redevelopment";

e.      on March 27, 2007, *Deseret News*, a Salt Lake City newspaper owned by Defendant LDS Corporation, published an article stating:

> Church officials have not said how much they expect the entire development to cost, though city officials and others have estimated it could be an investment of $1 billion or more.  Money for the project is not coming from LDS Church members' tithing donations.

and

f.      on October 5, 2012, Keith B. McMullin, formerly the second counselor in the LDS Church's Presiding Bishopric and former member of Defendant LDS Corporation, represented during an interview for *The Salt Lake Tribune* newspaper that tithing funds had not, and would not, be used for commercial purposes including City Creek Center:  "McMullin said not one penny of tithing goes to the Church's for-profit endeavors.  Specifically, the Church has said no tithing went toward City Creek Center."

125.   The representations were false because Defendants knew the funds to finance City Creek Center would be withdrawn from the EPA treasury account—a source that contained never-invested tithing funds.

126.   Defendants' intentional misrepresentations contradicted the LDS Church's published purposes for tithing funds, which were and are to educate its

members, conduct missionary work, build and maintain meetinghouses and temples, and to perform charitable work including care for the poor and needy.

127.   Defendants had an intent to defraud Plaintiff and the Class and to induce reliance on Defendant LDS Corporation's misrepresentations.  Defendants knew that Plaintiff and the Class would not have paid tithing, or would have been less likely to pay tithing, had Plaintiff and the Class known that their tithing funds were not being used for the LDS Church's published purposes.

128.   Defendants knew that Plaintiff and the Class would not have paid tithing, or would have been less likely to pay tithing, had Plaintiff and the Class known that their tithing funds were being used for commercial, for-profit purposes, including the financing of City Creek Center.

129.   Plaintiff and the Class justifiably relied on Defendant LDS Corporation's misrepresentations because Defendants were in a superior position over Plaintiff and the Class to know how tithing funds were being used; Plaintiff and the Class were not aware and could not have determined that tithing funds were being used for a commercial, for-profit purpose; and Plaintiff and the Class looked toward Defendants as fiduciaries to administer tithing funds according to the LDS Church's published purposes, including care for the poor and needy.

130.   As a result, Plaintiff and the Class were damaged by paying ten percent (10%) of their incomes as tithing when Plaintiff and the Class would not

have paid tithing, or would have been less likely to pay tithing, had they known that Defendants *were not* using tithing for the LDS Church's published purposes.

131.   Defendants are liable to Plaintiff and Class Members for damages in an amount to be proven at trial.

132.   Defendants acted with malice and fraud, and with intent to defraud Plaintiff and Class members for the purpose of enriching themselves at Plaintiff's and Class members' detriment; therefore, Defendants' conduct warrants substantial punitive and exemplary damages in an amount to be determined at trial.

**COUNT II**
**(Negligent Misrepresentation on behalf of the Nationwide Class or State Class)**

133.   Plaintiff incorporates by reference all material facts in this Complaint as if fully set forth herein.

134.   Plaintiff brings this Count on behalf of himself and the Nationwide Class or Statewide Class.

135.   In the alternative to Plaintiff's claims for fraudulent misrepresentation set forth in Count I above, Plaintiff alleges a claim of negligent misrepresentation.

136.   As alleged above, Defendant LDS Corporation made false statements of material fact that Defendant LDS Corporation was careless or negligent in ascertaining the truth of the statements when making them.

137.   Defendant LDS Corporation made misrepresentations of material fact to Plaintiff that tithing funds *would not* be used for commercial, for-profit purposes including the financing of City Creek Center in video broadcasts and print publications, as detailed herein *supra*.

138.   Defendant LDS Corporation made these misrepresentations with carelessness or negligence in ascertaining the truth of the statement because the funds would be withdrawn, or already had been withdrawn, from the EPA treasury account—a source that contained never-invested tithing funds.

139.   Defendants knew that Plaintiff and the Class would not have paid tithing, or would have been less likely to pay tithing, had Plaintiff and the Class known that their tithing funds *were not* being used for the LDS Church's published purposes.

140.   Defendants knew that Plaintiff and the Class would not have paid tithing, or would have been less likely to pay tithing, had Plaintiff and the Class known that their tithing funds were being used for commercial, for-profit purposes, including the financing of City Creek Center.

141.   Defendants knew that Plaintiff and the Class would not have paid tithing, or would have been less likely to pay tithing, had Plaintiff and the Class known that Defendants had amassed billions of dollars in cash surplus.

142.   Plaintiff and the Class justifiably relied on the truth of Defendant LDS Corporation's statements because Defendants were in a superior position over Plaintiff and the Class to know how tithing funds were being used; Plaintiff and the Class were not aware and could not have determined that tithing funds were being used for commercial, for-profit purposes, and Plaintiff and the Class looked toward Defendants as fiduciaries to administer tithing funds according to the LDS Church's published purposes, including care for the poor and needy.

143.   As a result, Plaintiff and the Class were damaged by paying ten percent (10%) of their incomes as tithing when Plaintiff and the Class would not have paid tithing had they known that Defendants were not using tithing for the LDS Church's published purposes.

144.   As a direct and proximate result of Defendant LDS Corporation's negligent misrepresentations, Plaintiff and the Class have been damaged in an amount to be determined at trial, including compensatory damages and all damages allowed by law.

## COUNT III
**(Breach Of Fiduciary Duty on behalf of the Nationwide Class or State Class)**

145.   Plaintiff incorporates by reference all material facts in this Complaint as if fully set forth herein.

146.   Plaintiff brings this Count on behalf of himself and the Nationwide Class or Statewide Class.

47

147.   Defendants "solicit funds" for "charitable purposes" and are thus "acting in a fiduciary capacity" as those terms are used by Utah Code §§ 13-22-2(3) and 13-22-23.

148.   Additionally, Plaintiff and the Class placed confidence in Defendants that Defendants would use tithing funds for the LDS Church's published purposes. Defendants accepted and assumed that confidence, resulting in Defendants having a fiduciary duty to Plaintiff and the Class wherein Defendants could not take advantage of Plaintiff and the Class's generosity.

149.   Defendants had a fiduciary duty to Plaintiff and the Class to use tithing funds according to the LDS Church's published purposes:  to build and maintain temples and meetinghouses, to sustain missionary work, to educate members, and to perform charitable work including care for the poor and needy.

150.   Importantly, Plaintiff and Class Members relied on Defendants as fiduciaries to distribute their donated tithing funds to the poor and needy in accordance with their intentions.

151.   Defendants breached that fiduciary duty by using tithing funds for a commercial, for-profit purpose, including using $1.4 billion for the financing of City Creek Center.

152.    As a direct and proximate result of Defendants' breach, Plaintiff and the Class have been damaged because Plaintiff and the Class paid ten percent

48

(10%) of their incomes as tithing believing Defendants would use tithing funds for the LDS Church's published purposes, including care for the poor and needy.

153.   Defendants' breach meant that Plaintiff and the Class were not able to fulfill their intentions for donating tithing funds and millions of dollars in charity never reached persons in need.

154.   As a direct and proximate result of Defendants' breach of fiduciary duty, Plaintiff and the Class have been damaged in an amount to be determined at trial, including compensatory damages and all damages allowed by law.

## COUNT IV
### (Unjust Enrichment on behalf of the Nationwide Class or State Class)

155.   Plaintiff incorporates  by reference all material facts in this Complaint as if fully set forth herein.

156.   Plaintiff brings this Count on behalf of himself and the Nationwide Class or Statewide Class.

157.   Plaintiff and the Class conferred a benefit on Defendants by paying ten percent (10%) of their incomes as tithing funds to the LDS Church, which Defendants received.

158.   Defendants received a benefit by accepting Plaintiff's and the Class's tithing funds.

159.   Defendants received and retained unjust benefits from Plaintiff and the Class, and inequity has resulted because Plaintiff and the Class paid tithing based on Defendant LDS Corporation's fraudulent misrepresentations that Plaintiff's and the Class's tithing funds *were not* being used for commercial, for-profit purposes when in fact, Defendants had used tithing funds for commercial, for-profit purposes, including $1.4 billion to finance City Creek Center.

160.   It is unjust, inequitable, and unconscionable for Defendants to retain these benefits because as donors, Plaintiff and the Class had intentions that were induced by fraud and Plaintiff's and the Class's reasons for being members in the LDS Church have been frustrated because Defendants did not use Plaintiff's and the Class's tithing for the LDS Church's published purposes.

161.   Defendants concealed their fraud and deception, and therefore Plaintiff and the Class were not aware of Defendants' fraudulent conduct.

162.   Defendants knowingly accepted the unjust benefits of their fraudulent conduct.

163.   As a result of Defendants' misconduct, the fruits of Defendants' unjust enrichment should be disgorged and returned to Plaintiff and the other Class Members in an amount to be proven at trial.

## COUNT V
**(Violation Of Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101, *et seq.* on behalf of the State Class)**

164.    Plaintiff incorporates by reference all material facts in this Complaint as if fully set forth herein.

165.    Plaintiff brings this Count on behalf of himself and the Statewide Class.

166.    Defendant LDS Corporation engaged in unfair or deceptive acts or practices when, in the course of its business, among other acts and practices, knowingly made misrepresentations of material fact regarding the use of Plaintiff's and the Class's tithing funds to induce Plaintiff and the Class to continue paying tithes in spite of its knowledge that Defendant LDS Corporation had purchased a commercial property and was developing that commercial property.

167.    Defendant LDS Corporation intended for Plaintiff and the Class to rely on its misrepresentations, and that Defendants were using tithing funds for the LDS Church's published purposes.

168.    Defendants intentionally failed or refused to disclose that they used $1.4 billion in tithing funds for a commercial, for-profit purpose—financing City Creek Center.

169.    Defendants' wrongful conduct and fraudulent misrepresentations were intended to induce Plaintiff and the Class to pay tithing funds because Defendants knew that Plaintiff and the Class would not have paid tithing, or would have been less likely to pay tithing, had Plaintiff and the Class known that their

tithing funds *were not* being used for the LDS Church's published purposes, and *were* in fact being used for a commercial, for-profit purpose—financing City Creek Center.

170.   Defendants' conduct constitutes unfair or deceptive acts or practices as defined by the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. §§ 47-18-109(a)(1).

171.   Plaintiff and the other statewide Class Members seek equitable relief, an award of attorneys' fees and costs, and punitive damages under Tenn. Code Ann. §§ 47-18-109, and any other just and proper relief available under the TCPA.

## COUNT VI
### (Civil Conspiracy)

172.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

173.   As detailed herein, Defendants LDS Corporation and EPA combined, collaborated, and conspired to shield from Plaintiff, the Class, and the general public that Defendants were using funds donated by church members and intended to be used for charitable and religious purposes for economic, profit-generating ventures that had nothing to do with the LDS Church's charitable and religious ventures.

174.   Defendants LDS Corporation and EPA, through their agents, employees, and representatives, had a meeting of the minds that the use of these

funds would be concealed, and developed a mechanism to so conceal it as detailed herein.

175.   Representatives of Defendants LDS Corporation and EPA took numerous affirmative steps in furtherance of their conspiracy, including but not limited to the misrepresentations and concealment referenced herein.

176.   As a direct and proximate result of Defendants' conspiracy and the unlawful, deceptive, and fraudulent conduct stemming therefrom, Plaintiff and the Class have sustained damages in an amount to be proven at trial.

177.   By virtue of Defendants' conspiracy to defraud the Class, they are jointly and severally liable for the harm flowing from the conspiracy.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this case be certified and maintained as a class action pursuant to the proposed Nationwide Class or Statewide Class, and respectfully requests that this Court:

A.      Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Nationwide Class and/or the Statewide Class as defined above;

B.      Appoint Plaintiff as the representative of the Class and his counsel as Class counsel;

C.      Award damages, including compensatory and exemplary damages, to

Plaintiff and all other Class Members;

D.      Award Plaintiff and Class Members actual damages sustained;

E.      Award Plaintiff and Class Members such additional damages, over

and above the amount of their actual damages, which are authorized and

warranted by law;

F.      Create a constructive trust for the benefit of Class Members

comprising all inequitably obtained monies and/or proceeds derived

therefrom;

G.      Grant equitable relief and restitution to Plaintiff and Class Members

and require Defendants to disgorge inequitable gains;

H.      Award Plaintiff and Class Members punitive damages;

I.      Award Plaintiff and Class Members their reasonable attorneys' fees

and reimbursement of all costs for the prosecution of this action; and

J.      Award such other relief as this Court deems just and appropriate.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands

a trial by jury on all issues so triable.

Dated:      December 22, 2023

Respectfully submitted,

MURPHY, COX, FRANKS & LASATER, P.C.

By:/s/ *Michael D. Cox*
    Michael D. Cox BPR #021173
    Attorney for Plaintiff
    P. O. Box 90
    Columbia, TN 38402-0090
    (931) 388-0832
    mcox@mcflattorneys.com

**Jacob A. Flint**
(Mo. Bar No. 60740), *to be admitted Pro Hac Vice*
jacob@jacobflintlaw.com
JACOB FLINT LAW
2 CityPlace Dr. #200
St. Louis, MO 63141
phone:  314-677-7613

*Attorneys for Plaintiff and the Class*