Mark S. Mester (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois  60611
Telephone:  (312) 876-7700
Email:  mark.mester@lw.com

Jason R. Burt (Utah Bar No. 11200)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C.  20004-1304
Telephone:  (202) 637-2200
Email:  jason.burt@lw.com

Randy T. Austin (Utah Bar No. 6171)
Wade L. Woodard (Utah Bar No. 18155)
Justin W. Starr (Utah Bar No. 10708)
KIRTON MCCONKIE PC
36 South State Street, Suite 1900
Salt Lake City, Utah  84111
Telephone: (801) 328-3600
Email: raustin@kmclaw.com
          wwoodard@kmclaw.com
          jstarr@kmclaw.com

David J. Jordan (Utah Bar No. 1751)
Wesley F. Harward (Utah Bar No. 15623)
FOLEY & LARDNER LLP
95 South State Street, Suite 2500
Salt Lake City, Utah  84111
Telephone: (801) 401-8900
Email: djordan@foley.com
          wharward@foley.com

*Counsel for Defendants The Church of Jesus Christ of Latter-day Saints and Ensign Peak Advisors, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| IN RE: THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS TITHING LITIGATION<br><br>*This document relates to all actions.* | **MOTION TO STAY DISCOVERY PENDING RESOLUTION OF MOTIONS TO DISMISS**<br><br>Case No. 2:24-md-03102-RJS-DAO<br><br>Chief Judge Robert J. Shelby<br><br>Magistrate Judge Daphne A. Oberg |

Date:  August 9, 2024

**RELIEF REQUESTED**

Pursuant to Rule 26, U.S. Supreme Court authority, Tenth Circuit authority and the Court's inherent authority, Defendants respectfully ask the Court to stay discovery until their forthcoming motions to dismiss have been resolved by the Court.

## I.     INTRODUCTION

"Given the burden, time, and expense often associated with responding to discovery in a putative class action, courts regularly stay discovery pending a ruling on a motion to dismiss." Rodriguez v. Ford, 2022 WL 704780, *2 (N.D. Ill. 2022). And this is certainly no ordinary class case. It is instead a sprawling class action against a worldwide religious organization, The Church of Jesus Christ of Latter-day Saints (the "Church"), filed by a handful of <u>dissenters</u> who seek approval from the Court to represent millions of <u>faithful</u> members of the Church in an effort to have the Court examine and redefine how the Church pursues its religious mission.

This case is extraordinary in several other ways. <u>First</u>, Plaintiffs (all but one of whom are apparently no longer even Church members) claim to adequately represent believing and active Church members. Plaintiffs plead in conclusory fashion that "their interests do not conflict with the interests of other members of the Class they seek to represent" and that the "interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel." Consol. Compl. (MDL Dkt. 63) ¶ 143. But the conflict is palpable. Indeed, Plaintiffs offer no reason why millions of faithful tithe-paying Church members would want any part in Plaintiffs' attack on the Church. And they offer no rationale for how persons who lack faith in the doctrine of tithing as taught by the Church can adequately represent millions of persons who have faith on a matter that itself is deeply rooted in faith.

For nearly two centuries, the Church has taught that giving tithes is a commandment from God. There have literally been hundreds of sermons by the Church's ecclesiastical leaders on the subject. Yet every Church member makes an individual, faith-based decision to give tithes or not. Obeying the scriptural law of tithing requires faith that (1) God exists, (2) he has called prophets

1

in modern times through which not only the commandment to tithe, but also the responsibility for the timing and disposition thereof, has been given, and (3) God will bless those who obey that commandment. This faith is based on deeply personal religious experiences developed over a lifetime. Thus, this is anything but a garden-variety consumer class action based on misrepresentations about a product or service. Indeed, it is the polar opposite of the type of case for which the class device is best suited and for which the requirements of adequate representation possibly could be met.

How can Plaintiffs who do not share that faith adequately represent those who believe? Even in a secular context, courts have held in cases involving alleged fraud that issues of individualized reliance are _not_ suitable for class treatment. See, e.g., Castano v. Am. Tobacco, 84 F.3d 734, 745 (5th Cir. 1996) ("[A] fraud class action cannot be certified when _individual_ reliance will be an issue.").[1] All the more so where reliance is _fundamentally_ a matter of faith and would require a court to adjudicate issues of faith. For that reason, the First Amendment prohibits class treatment when the individualized experience at issue is religious. "Religious experiences which are as real as life to some may be incomprehensible to others." U.S. v. Ballard, 322 U.S. 78, 86-87 (1944). And because Plaintiffs do not and cannot adequately represent the members of the proposed class, they should not be allowed to commence discovery that conflicts with the interests of the class. See, e.g., Phillips Petroleum v. Shutts, 472 U.S. 797, 812 (1985) ("[T]he Due Process clause of course requires that the named plaintiff _at all times_ adequately represent the interests of the absent class members.").

Second, as will be explained in great detail in the forthcoming motions to dismiss, Plaintiffs target the core First Amendment right of the Church to "decide for [itself], free from state interference, matters of _church government_ as well as those of faith and doctrine." Hosanna-Tabor Evang. v. EEOC, 565 U.S. 171, 186 (2012). Plaintiffs object to the Church's reserve fund: (1) its

---

[1] All emphasis is supplied, and all internal citations, quotations and footnotes are omitted.

2

size; (2) how it's invested; (3) the duration of such investments; and (4) the extent of disclosure. The claims, however, of disenchanted members about how the Church accomplishes its mission implicate precisely the kind of internal church conflict the First Amendment prohibits courts from adjudicating.  See, e.g., The Bible Way Church v. Beards, 680 A.2d 419, 429 (D.C. App. 1996) ("[A] church's financial regime, including any required reports to members, necessarily reflects an array of decisions about a member's obligation to pledge funds, and about the leaders' corresponding responsibility to account for those funds, that a civil court cannot arbitrate without entangling itself in doctrinal interpretations[.]").

It is likewise well-established that discovery should be delayed where (as here) the Church Autonomy Doctrine is implicated.  The Tenth Circuit has equated the Church Autonomy Doctrine with qualified immunity and directed that, like qualified immunity, the Church Autonomy Doctrine must "be resolved at the earliest possible stage of litigation" to "protect[] a church's Free Exercise rights."  Bryce v. Episcopal Church, 289 F.3d 648, 654 (10th Cir. 2002).  Accordingly, the Court should at a minimum stay discovery until it determines whether Plaintiffs' claims are barred by the Church Autonomy Doctrine, which will be extensively addressed in the forthcoming motions to dismiss to be filed next month by the Church and Ensign Peak Advisors, Inc. ("Ensign Peak").

## II.   RELEVANT FACTS

Plaintiffs claim the Church defrauded them and breached a fiduciary duty by investing some portion of their donations.  See Consol. Compl. ¶¶ 150-54.  According to their pleadings, "Plaintiffs did not believe and had no reason to even suspect that LDS would take any portion of their donations and invest it…"  Id. ¶ 132.  Plaintiffs claim instead that all donations should be used "immediately" and contend that any investment by the Church of donations is somehow antithetical to the Church's mission, as Plaintiffs and their counsel ask the Court to now define that mission.  Id.  Based on these allegations, Plaintiffs ask the Court to, inter alia, appoint a Special Master to "monitor the collection, use and disposition of collected funds." Id. ¶ 193.

3

### III.  ARGUMENT

**A.   Courts generally have broad discretion to stay discovery.**

"The Tenth Circuit has noted that district courts have 'broad discretion' in deciding whether to stay discovery." White Knuckle IP v. EA, 2015 WL 5022579, *1 (D. Utah 2015); see also Rigler v. Lampert, 2016 WL 10576626, *2 (D. Wyo. 2016) ("In the Tenth Circuit, courts are given broad discretion… to stay discovery pending a decision on a dispositive motion."). "A stay of discovery pending the determination of a dispositive motion is an eminently logical means to prevent wasting the time and effort of all concerned, and to make the most efficient use of judicial resources." USIC v. Project Res., 2022 WL 1212781, *3 (D. Colo. 2022).

**B.   A stay of discovery is mandated where a case raises issues implicating the Church Autonomy Doctrine.**

The Court's discretion in this case should be controlled by the fact that Plaintiffs' claims <u>directly</u> implicate the Church Autonomy Doctrine. See, e.g., Bryce, 289 F.3d at 657. "Courts have held that churches have autonomy in making decisions regarding their own <u>internal</u> affairs. This church autonomy doctrine prohibits civil court review of internal church disputes involving matters of faith, doctrine, <u>church</u> governance, and <u>polity</u>." Id. at 655.

When a defendant invokes "qualified immunity," discovery "should not be allowed" until the issue is fully resolved. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The Tenth Circuit has, in turn, mandated the <u>same</u> approach where the Church Autonomy Doctrine is at issue:

> If the church autonomy doctrine applies… then the plaintiffs have no claim for which relief may be granted. In this sense, the assertion that the First Amendment precludes the [claim] is similar to a government official's defense of qualified immunity, which is frequently asserted in a motion to dismiss under Rule 12(b)(6).

Bryce, 289 F.3d at 654. Thus, to "protect[] a church's Free Exercise rights," the Church Autonomy Doctrine, which presents "a question of law," should "be resolved at the <u>earliest</u> possible stage of litigation." Id. at 654. By resolving the question "<u>early</u> in litigation, the courts avoid excessive

4

entanglement in church matters." Id. at 654 n.1.[2]  And like the Eleventh Amendment and the Speech or Debate Clause, the Church Autonomy Doctrine is rooted in express constitutional protections and operates as a complete bar against claims involving internal church decisions. See Bryce, 289 F.3d at 657.[3]

### C.   Plaintiffs' claims plainly violate the Church Autonomy Doctrine.

The Church's forthcoming motion to dismiss will show that the Church Autonomy Doctrine prohibits Plaintiffs' claims.[4]  See generally Serbian E. Orthodox Diocese v. Milivojevich, 426 U.S. 696, 709-10 (1976) (holding that internal matters of church organization and governance may not be reviewed by courts, even if they incidentally affect the disposition of property).  "The First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes."  Presb. Church v. Blue Hull Mem'l Presb. Church, 393 U.S. 440, 449 (1969).  At its core, this case is about control over Church property (money). See Consol. Compl. ¶ 15.  Adjudicating Plaintiffs' claim that the Church committed fraud by using donations "in manners antithetical to the purported mission" of the Church (id. ¶ 132) would require the Court to second

---

[2] The Church and Ensign Peak are scheduled to respond to the Consolidated Complaint on September 10, 2024, and a focus of their submissions will be the First Amendment and the Church Autonomy Doctrine.  See Pretrial Order No. (MDL Dkt. 60) at 1; Hr'g Tr. (MDL Dkt. 61) at 17-18.

[3] We recognize that in other contexts, courts in this district have applied a different standard for stays of discovery in commercial disputes.  See Classic Aviation v. Harrower, 2021 WL 633587, *3 (D. Utah 2021).  Like a case that implicates the qualified immunity doctrine, however, this is certainly not a commercial dispute, and the Tenth Circuit's decision in Bryce sets the standard here.  See disc. supra at Section III.B.  The Court's decision in Classic Aviation was also based on a line of cases dating back to Landis, which addressed a stay of the entire case, not simply a stay of discovery.  See Commodity Futures Trading v. Chilcott Portfolio, 713 F.2d 1477, 1484-85 (10th Cir. 1983) (citing Landis v. N. Am. Co., 299 U.S. 248, 254-55 (1936)).  The Church, however, is not asking to stay the case at this juncture.  It is simply asking that consistent with Bryce, discovery be stayed so that the Court can fully address the Church Autonomy Doctrine.  See Bryce, 289 F.3d at 654-55.

[4] Provided below is only a summary of the Church's arguments with respect to the Church Autonomy Doctrine.  See disc. infra at Section III.C.  These arguments will be fully addressed in the forthcoming motions to dismiss of the Church and Ensign Peak.  For purposes of this motion, however, the important point is that as required by Bryce, discovery should not be allowed to commence until the Court has had a full opportunity to consider those arguments and rule on those forthcoming motions.  See Bryce, 289 F.3d at 654-55.

guess decisions made by the Church's duly-appointed ecclesiastical leaders regarding what the Church's mission is and should be, the prophesied future of the Church, the prioritization and timing of Church expenditures and programs, the amount of funds needed currently versus the future to fulfill the Church's destiny and how to invest reserve funds. See, e.g., Harris v. Matthews, 643 S.E.2d 566, 570-72 (N.C. 2007). "Because a church's religious doctrine and practice affects its understanding of" how funds should be used, "seeking a court's review of [church governance] matters… is no different than asking a court to determine whether a particular church's grounds for membership are spiritually or doctrinally correct or whether a church's charitable pursuits accord with the congregation's beliefs." Id. at 571; see also id. at 572 ("[W]hen a party challenges church actions involving religious doctrine and practice, court intervention is constitutionally forbidden").

Plaintiffs' claims are largely based on the assertion that the Church owed them a fiduciary duty. See Consol. Compl. ¶¶ 15, 48, 146-56, 173. That too raises First Amendment issues. "Defining such a duty… would embroil the courts" in matters of church doctrine and beliefs. Franco v. Church, 21 P.3d 198, 206 (Utah 2001). Plaintiffs' assertion that the Church had a "duty to disclose" financial information (Consol. Compl. ¶¶ 48, 173, 174) likewise directly raises First Amendment issues. See, e.g., Beards, 680 A.2d at 429. The First Amendment prohibits courts from becoming "arbiters of the appropriate level of disclosure to the church's members in… matters of ecclesiastical fiscal administration…" Id. Moreover, the duty, reliance and materiality elements of Plaintiffs' fraud-based claims raise serious First Amendment questions themselves. Rejecting a similar claim against the Church, this Court concluded that it "cannot adjudicate the duty or materiality elements without running afoul of" the First Amendment. Gaddy v. Church, 665 F.Supp.3d 1263, 1289 (D. Utah 2023).[5]

---

[5] Plaintiffs' assertion that the Church committed fraud by allegedly using "tithing" to pay for City Creek similarly raises matters protected by the First Amendment. "[B]ecause Plaintiff's argument effectively asks this Court to define the term 'tithing funds,' the First Amenodment bars Plaintiff's
(continued…)

6

The Consolidated Complaint also unavoidably challenges Church doctrine regarding control over Church funds. Church scripture declares that tithing is controlled by a council of Church leaders who act according to "[God's] own voice unto them." See Doctrine & Covenants 120. From the beginning, Church leaders have taught that donations belong to God:

> When I [give tithes], that which I give is no longer mine. It belongs to the Lord to whom I consecrate it. What the authorities of the Church do with it need not concern me. They are answerable to the Lord, who will require an accounting at their hands.

G. Hinckley, "Rise to a Larger Vision of the Work," *Ensign*, April 1990. Under Church doctrine, therefore, tithing donations to the Church are unrestricted gifts, and God directs how such funds are used. The Church Autonomy Doctrine is rooted in part in the idea that "'[a]ll who unite themselves to [a church] do so with an implied consent to [its] government, and are bound to submit to it.'" Serbian E. Orthodox Diocese, 426 U.S. at 711. Plaintiffs' lawsuit, however, directly challenges the very doctrine they once believed in and consented to and in so doing, directly implicates First Amendment concerns. See id.

In sum, the First Amendment "requires that the Court" strictly avoid "interfer[ing] with the Church's ability to make governance and spending decisions," because "[h]ow a church spends worshippers' contributions" is "central to the exercise of religion." Ambellu v. Re'ese Adbarat, 387 F.Supp.3d 71, 80 (D.D.C. 2019). And at the very least, Plaintiffs' claims raise serious questions under the Church Autonomy Doctrine. Discovery should, therefore, be stayed until the Court has determined whether the First Amendment bars adjudication of Plaintiffs' claims in a court of law.

---

argument." Huntsman v. Church, 2021 WL 4296208, *6 n.4 (C.D. Cal. 2021). A three-judge Ninth Circuit panel reversed the district court's decision, but an en banc panel recently vacated that decision, rendering it a nullity. See Huntsman v. Church, 76 F.4th 962 (9th Cir. 2023). Argument en banc in Huntsman is scheduled for September 25, 2024.

### D. A stay is also appropriate, because discovery itself would raise serious First Amendment issues.

A stay is necessary not only because Plaintiffs' <u>claims</u> raise serious First Amendment issues, but also because <u>discovery</u> itself may infringe on the Church's First Amendment rights. Discovery risks "incremental" violation of "rights guaranteed by the Religion Clauses." <u>Demkovich v. St. Andrew</u>, 3 F.4th 968, 982, 984 (7th Cir. 2021) (en banc).[6] Indeed, the "rule of <u>Hosanna-Tabor</u>" was established by the Supreme Court "precisely to avoid… judicial entanglement" such as "subjecting religious doctrine to discovery." <u>Sterlinski v. Catholic Bishop</u>, 934 F.3d 568, 570 (7th Cir. 2019). "It is well established… that courts should refrain from trolling through a person's or institution's religious beliefs." <u>Mitchell v. Helms</u>, 530 U.S. 793, 828 (2000). Doing so is "not only unnecessary but also offensive." <u>Id.</u> In short, when a plaintiff challenges a church's practices, "it is not only the conclusions that may be reached" by courts that "impinge on rights guaranteed by the Religion Clauses, but also the very <u>process</u> of inquiry leading to findings and conclusions." <u>NLRB v. Catholic Bishop</u>, 440 U.S. 490, 502 (1979). Permitting discovery into these claims would create the "substantial danger that the State will become entangled in essentially religious controversies." <u>Serbian E. Orthodox Diocese</u>, 426 U.S. at 709.

"[T]he Constitution's protection is not limited to direct infringement with fundamental rights." <u>Healy v. James</u>, 408 U.S. 169, 183 (1972). First Amendment freedoms "are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." <u>Bates v. Little Rock</u>, 361 U.S. 516, 523 (1960).[7] Treading lightly where First

---

[6] Being "deposed, interrogated, and haled into court" can chill First Amendment rights by causing religious institutions to make decisions "with an eye to avoiding litigation or bureaucratic entanglement" instead of religious considerations. <u>EEOC v. Catholic Univ.</u>, 83 F.3d 455, 467 (D.C. Cir. 1996).

[7] In <u>NAACP v. Alabama</u>, 357 U.S. 449 (1958), the Supreme Court held that courts could not compel disclosure of membership in organizations engaged in political and social advocacy, because disclosure could have a "chilling effect" on First Amendment rights. The right of "religious organizations to maintain their internal organizational autonomy intact from ordinary discovery should be at least as secure as the protection afforded other associations." <u>Whole Woman's Health v. Smith</u>, 896 F.3d 362, 374 (5th Cir. 2018). Thus, the First Amendment provides

(continued…)

Amendment rights are concerned is appropriate because of the Supreme Court's frequent admonition that "'First Amendment freedoms need breathing space to survive.'" Wyo. Gun Owners v. Gray, 83 F.4th 1224, 1248 (10th Cir. 2023). Courts should also tread carefully, because violating such rights is incurable. "'[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" Pac. Frontier v. Pleasant Grove City, 414 F.3d 1221, 1235 (10th Cir. 2005).

### E. Plaintiffs' claims also face non-constitutional hurdles.

Bryce aside, the facial defects in the Consolidated Complaint would otherwise warrant a stay of discovery, as would the traditional factors the Tenth Circuit has directed courts to balance in determining whether a discovery stay is warranted. See generally In re Broiler Chicken, 2017 WL 3841912, *2-3 (E.D. Okla. 2017) (Shelby, J.); String Cheese Incident v. Stylus Shows, 2006 WL 894955, *2 (D. Colo. 2006). Among other things, Plaintiffs' claims are premised on the existence of a fiduciary duty between the Church and its members, but this Court has determined "there is no legally cognizable general fiduciary duty between a church and its members." Gaddy, 665 F.Supp.3d at 1291. Moreover, a church's investment of donated funds for future religious use is scarcely fraud. See, e.g., Stone v. Salt Lake City, 356 P.2d 631, 633-34 (Utah 1960). None of the funds donated have been lost or misappropriated. Plaintiffs do not suggest otherwise. It is "common sense and common knowledge" that churches will manage their funds "for the ultimate accomplishment" of their religious objectives and mission, as those objectives and mission are determined by the Church itself and its leaders. See id.

Separately, Plaintiffs are not entitled to discovery without a plausible claim. As the Tenth Circuit has made clear, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements,… no longer suffice to unlock the doors of discovery." Ghailani v. Sessions, 859 F.3d 1295, 1304 (10th Cir. 2017); see also Limestone Dev. v. Vill. of Lemont, 520

---

protection from discovery where disclosure would cause a "chilling of the decision making process." Colo. Christian Univ. v. Weaver, 534 F.3d 1245, 1264 (10th Cir. 2008).

9

F.3d 797, 802-03 (7th Cir. 2008) (noting that "Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) teaches that a defendant should not be forced to undergo costly discovery unless the complaint" pleads a valid claim). That admonition is particularly apt in cases involving claims subject to the heightened pleading standard of Rule 9(b), which "has long played [a] screening function, standing as a gatekeeper to discovery, a tool to weed out meritless fraud claims sooner than later." U.S. ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 185 (5th Cir. 2009); see also Plastic Packaging v. Sun Chem., 136 F. Supp. 2d 1201, 1204 (D. Kan. 2001) ("[A]llowing non-particular fraud claims to proceed to discovery defeats Rule 9(b)'s purposes of bringing an early end to frivolous claims which bring reputational damage."). Accordingly, the Court should stay discovery until it has determined whether Plaintiffs have plead valid claims.

## IV. CONCLUSION

The "well-established" Church Autonomy Doctrine "means what it says: churches must have 'independence in matters of faith and doctrine and in closely linked matters of internal government.'" Demkovich, 3 F.4th at 975 (quoting Our Lady of Guadalupe School v. Morrisey-Berru, 140 S.Ct. 2049, 2061 (2020)). Plaintiffs' claims and the discovery they seek threaten that constitutionally-protected autonomy. For that reason and the others noted herein, the Church respectfully requests the Court stay discovery until the forthcoming motions to dismiss have been resolved by the Court.

Date: August 9, 2024

Respectfully submitted,

*/s/ Mark S. Mester*
Mark S. Mester, *Counsel for Defendants The Church of Jesus Christ of Latter-day Saints and Ensign Peak Advisors, Inc.*

Mark S. Mester (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700
Email: mark.mester@lw.com

Jason R. Burt (Utah Bar No. 11200)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C.  20004-1304
Telephone:  (202) 637-2200
Email:  jason.burt@lw.com

Randy T. Austin (Utah Bar No. 6171)
Wade L. Woodard (Utah Bar No. 18155)
Justin W. Starr (Utah Bar No. 10708)
KIRTON MCCONKIE PC
36 South State Street, Suite 1900
Salt Lake City, Utah  84111
Telephone: (801) 328-3600
Email: raustin@kmclaw.com
          wwoodard@kmclaw.com
          jstarr@kmclaw.com

David J. Jordan (Utah Bar No. 1751)
Wesley F. Harward (Utah Bar No. 15623)
FOLEY & LARDNER LLP
95 South State Street, Suite 2500
Salt Lake City, Utah  84111
Telephone: (801) 401-8900
Email:   djordan@foley.com
          wharward@foley.com

*Counsel for Defendants The Church of Jesus Christ of Latter-day Saints and Ensign Peak Advisors, Inc.*