Mark S. Mester (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Email:  mark.mester@lw.com

Randy T. Austin (Utah Bar No. 6171)
Wade L. Woodard (Utah Bar No. 18155)
Justin W. Starr (Utah Bar No. 10708)
KIRTON MCCONKIE PC
36 South State Street, Suite 1900
Salt Lake City, Utah 84111
Telephone: (801) 328-3600
Email: raustin@kmclaw.com
        wwoodard@kmclaw.com
        jstarr@kmclaw.com

Jason R. Burt (Utah Bar No. 11200)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone:  (202) 637-2200
Email:  jason.burt@lw.com

David J. Jordan (Utah Bar No. 1751)
Wesley F. Harward (Utah Bar No. 15623)
FOLEY & LARDNER LLP
95 South State Street, Suite 2500
Salt Lake City, Utah 84111
Telephone: (801) 401-8900
Email: djordan@foley.com
        wharward@foley.com

*Counsel for Defendant The Church of Jesus Christ of Latter-day Saints*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| IN RE: THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS TITHING LITIGATION<br><br>*This document relates to all actions.* | **MOTION TO DISMISS OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, A UTAH CORPORATION SOLE AND MEMORANDUM IN SUPPORT**<br><br>Case No. 2:24-md-03102-RJS-DAO<br><br>Chief Judge Robert J. Shelby<br><br>Magistrate Judge Daphne A. Oberg |

# TABLE OF CONTENTS

**Page**

RELIEF REQUESTED .................................................................................................1

INTRODUCTION ........................................................................................................1

PLAINTIFFS' ALLEGATIONS ..................................................................................5

LEGAL STANDARD ..................................................................................................6

ARGUMENT ...............................................................................................................6

I.   THE CHURCH MANAGES ITS FINANCES IN COMPLIANCE WITH THE LAWS AND REGULATIONS GOVERNING CHURCHES AND OTHER CHARITIES ...................................................................................................7

II.  THE CHURCH AUTONOMY DOCTRINE BARS PLAINTIFFS' CLAIMS .................9

    A.   The Church Autonomy Doctrine Bars Suits Over Control Of Church Finances ...................................................................................................9

    B.   The Church Autonomy Doctrine Protects A Church's Decisions About The Degree Of Financial Disclosure To Members ...............................15

    C.   Plaintiffs' Requested Relief Plainly Violates The Church Autonomy Doctrine ...............................................................................................16

III. PLAINTIFFS FAIL TO STATE A CLAIM ....................................................17

    A.   Plaintiffs Fail To State A Claim For Breach Of Fiduciary Duty ..........17

        1.   The Church Does Not Owe Plaintiffs A Fiduciary Duty ...........17

        2.   Plaintiffs Have Not Pled Any <u>Breach</u> Of An Alleged Fiduciary Duty ...........................................................................................19

        3.   Plaintiffs Lack Standing To Pursue A Claim For Breach Of Fiduciary Duty ........................................................................19

    B.   Plaintiffs Fail To State A Claim For Fraudulent Inducement Or Fraudulent Misrepresentation ...............................................................20

        1.   Fraudulent Inducement (Count 2)—Plaintiffs Fail To Plead Falsity .........21

        2.   Fraudulent Misrepresentation (Count 4)—Plaintiffs Fail To Plead Falsity ...........................................................................23

**Page**

   3. Counts 2 And 4—Plaintiffs Fail To Adequately Plead Reliance..............24

 C. Plaintiffs Fail To State A Claim For Fraudulent Concealment...........................27

  1. The Church Did Not Owe Plaintiffs A Duty Of Disclosure ....................28

  2. Plaintiffs Do Not Plead And Cannot Establish Materiality ......................28

 D. Plaintiffs Fail To Plead Unjust Enrichment ...........................................................29

IV. PLAINTIFFS' CLAIMS ARE TIME-BARRED..................................................................30

 A. Utah's Three-Year Statute Of Limitations Applies To Plaintiffs' Fraud Claims ..........................................................................................................................30

 B. Plaintiffs' Fraud Claims Accrued More Than Three Years Before Plaintiffs Filed Suit ..............................................................................................31

 C. Equitable Tolling Does Not Apply ........................................................................34

 D. Plaintiffs' Claim For Breach Of Fiduciary Duty Is Barred.................................34

 E. Plaintiffs' Unjust Enrichment Claim Is Also Time-Barred .................................35

CONCLUSION..............................................................................................................................36

## <u>TABLE OF AUTHORITIES</u>

<b>Page(s)</b>

### CASES

Alpine Methodist Episcopal Church v. N.J. United Methodits Church,
  2017 WL 6492523 (N.J. Sup. Ct. 2017) .................................................................... 12

Amato v. Greenquist,
  679 N.E.2d 446 (Ill. App. 1997) ............................................................................. 18

Ambellu v. Re'ese Adbarat,
  387 F. Supp. 3d 71 (D.D.C. 2019) ..................................................................... 11, 12

Applied Predictive Techs. v. MarketDial,
  598 F. Supp. 3d 1264 (D. Utah 2022) .................................................................... 31

Ashcroft v. Iqbal,
  556 U.S. 662 (2009) ............................................................................................... 6

Asian Am. Entm't v. Las Vegas Sands,
  324 Fed. Appx. 567 (9th Cir. 2009) ....................................................................... 30

Bell Atl. v. Twombly,
  550 U.S. 544 (2007) ............................................................................................... 6

Bell v. Presbyterian Church,
  126 F.3d 328 (4th Cir. 1997) ............................................................................. 9, 10

Berrett v. Stevens,
  690 P.2d 553 (Utah 1984) ..................................................................................... 29

Bible Way Church v. Beards,
  680 A.2d 419 (D.C. App. 1996) ........................................................... 10, 11, 13, 16

Broker's Choice v. NBC,
  861 F.3d 1081 (10th Cir. 2017) .......................................................................... 3, 33

Bryan R. v. Watchtower Bible,
  738 A.2d 839 (Me. 1999) ....................................................................................... 18

Bryce v. Episcopal Church,
  289 F.3d 648 (10th Cir. 2002) ................................................................. 5, 9, 14, 36

Carl J. Herzog Found. v. Univ. of Bridgeport,
  699 A.2d 995 (Conn. 1997) .................................................................................... 19

Carrier v. Ravi Zacharias Int'l Ministries,
  2022 WL 1540206 (N.D. Ga. 2022) ....................................................................... 14

**Page(s)**

Chinitz v. Ally Bank,
  2020 WL 1692817 (D. Utah 2020) .......................................................... 25

Church of Scientology v. Clearwater,
  2 F.3d 1514 (11th Cir. 1993) ................................................................... 16

Colosimo v. Roman Catholic Bishop,
  156 P.3d 806 (Utah 2007) ........................................................................ 31

Corbrus v. 8th Bridge Cap.,
  2021 WL 2781811 (C.D. Cal. 2021) ....................................................... 35

Courtenay C. & Lucy Patten Davis Found. v. Colo. State Univ.,
  320 P.3d 1115 (Wyo. 2014) ..................................................................... 20

Crookston v. Fire Ins. Exch.,
  817 P.2d 789 (Utah 1991) ........................................................................ 20

Donner v. Nicklaus,
  197 F. Supp. 3d 1314 (D. Utah 2016) ....................................... 31, 32, 34

Dow Chem. v. Weevil-Cide,
  897 F.2d 481 (10th Cir. 1990) ................................................................. 30

El Pescador Church v. Ferrero,
  594 S.W.3d 645 (Tex. App. 2019) .................................................... 12, 27

Emergency Physicians v. Salt Lake Cnty.,
  167 P.3d 1080 (Utah 2007) ...................................................................... 30

Emp. Div., Dep't of Hum. Res. of Oregon v. Smith,
  494 U.S. 872, 887 (1990) ......................................................................... 29

Estate of Lockett v. Fallin,
  841 F.3d 1098 (10th Cir. 2016) ............................................................... 32

First Sec. Bank v. Banberry Dev.,
  786 P.2d 1326 (Utah 1990) ...................................................................... 19

Foman v. Davis,
  371 U.S. 178 (1962) ................................................................................. 36

Franco v. Church,
  21 P.3d 198 (Utah 2001), overturned on other grounds
  Williams v. Kingdom Hall, 491 P.3d 852 (Utah 2021) ..................... 17, 18

Fratello v. Archdiocese of N.Y.,
  863 F.3d 190 (2d Cir. 2017) .................................................................... 13

**Page(s)**

Gables at Sterling v. Castlewood-Sterling,
   417 P.3d 95 (Utah 2018) ............................................................................. 17

Gaddy v. Corp. of the President of the Church of Jesus Christ
   of Latter-day Saints, 451 F. Supp. 3d 1227 (D. Utah 2020)................................. 17, 20, 23, 28

Gaddy v. Corp. of the President of the Church of Jesus Christ
   of Latter-day Saints, 665 F. Supp. 3d 1263 (D. Utah 2023)........ 4, 18, 19, 26, 27, 28, 29, 34, 36

Grynberg v. Total S.A.,
   538 F.3d 1336 (10th Cir. 2008) ................................................................... 31

Harris v. Matthews,
   643 S.E.2d 566 (N.C. 2007) ....................................................................... 12

Hawthorne v. Couch,
   911 So.2d 907 (La. App. 2005) .................................................................... 27

Herbst v. Univ. of Colo.,
   513 P.3d 388 (Colo. App. 2022)................................................................... 19

Heritage Vill. Church v. State,
   263 S.E.2d 726 (N.C. 1980) ....................................................................... 12

Hosanna-Tabor Evangelical Lutheran Church v. EEOC,
   565 U.S. 171 (2012) ............................................................................... 4, 17

Hughes v. Vanderbilt Univ.,
   215 F.3d 543 (6th Cir. 2000) ...................................................................... 32

Huntsman v. Corp. of the President of the Church of Jesus Christ
   of Latter-day Saints, 2021 WL 4296208 (C.D. Cal. 2021) ................................. 24, 34

Huntsman v. Corp. of the President of the Church of Jesus Christ
   of Latter-day Saints, 76 F.4th 962 (9th Cir. 2023) ............................................. 24

Huntsman v. Corp. of the President of the Church of Jesus Christ
   of Latter-day Saints, 94 F.4th 781 (9th Cir. 2024) ......................................... 24, 34

In re Air Crash Disaster,
   644 F.2d 594 (7th Cir. 1981) ...................................................................... 30

In re Godwin,
   293 S.W.3d 742 (Tex. App. 2009) ................................................................ 12

In re TMJ Implants,
   97 F.3d 1050 (8th Cir. 1996) ...................................................................... 30

Innovasis v. English,
   2023 WL 8627757 (D. Utah 2013).............................................................. 34

**Page(s)**

Jackson v. Educ. & Emp't Ministry,
   686 Fed. Appx. 577 (10th Cir. 2017) ............................................................... 18

Johnson v. Bank of Am.,
   2015 WL 7776808 (C.D. Cal. 2015) ............................................................... 35

Kahn v. Deutsche Bank,
   978 N.E.2d 1020 (Ill. 2012)............................................................................ 31

Kedroff v. St. Nicholas Cathedral,
   344 U.S. 94 (1952) ........................................................................................ 16

Koch v. Koch Indus.,
   203 F.3d 1202 (10th Cir. 2000) ................................................................. 6, 25

Langford v. Roman Cath. Diocese,
   677 N.Y.S.2d 436 (Sup. Ct. 1998), aff'd, 705 N.Y.S.2d 661 (App. Div. 2000) ...................... 18

Libhart v. Copeland,
   949 S.W.2d 783 (Tex. App. 1997) .................................................................. 14

McDougal v. Weed,
   945 P.2d 175 (Utah 1997) ............................................................................. 28

McIntyre v. U.S.,
   367 F.3d 38 (1st Cir. 2004) ...................................................................... 32, 34

Medical Educ. Assistance v. East Tenn. State Univ.,
   19 S.W.3d 803 (Tenn. App. 1999) ................................................................. 31

Mitchell v. Christensen,
   31 P.3d 572 (Utah 2001) ............................................................................... 28

Morris v. Scribner,
   508 N.E.2d 136, 139 (N.Y. 1987) ................................................................. 23

Nakkhumpun v. Taylor,
   782 F.3d 1142 (10th Cir. 2015) ..................................................................... 24

Nolan v. Hoopiiaina,
   144 P.3d 1129 (Utah 2006) ........................................................................... 34

Our Lady of Guadalupe Sch. v. Morrissey-Berru,
   591 U.S. 732 (2020) ....................................................................................... 9

Parrish v. Arvest Bank,
   717 Fed. Appx. 756 (10th Cir. 2017) ............................................................. 25

Paulson v. Abbott Labs.,
   39 F.4th 473 (7th Cir. 2022) .......................................................................... 30

**Page(s)**

Pearson Family Members Found. v. Univ. of Chi.,
  2018 WL 3214219 (N.D. Okla. 2018) ................................................... 18

Peeler v. Way Int'l,
  2006 WL 1864662 (Tenn. App. 2006) ................................................... 27

Pero v. Knowlden,
  336 P.3d 55 (Utah App. 2014) ............................................................... 35

Petrell v. Shaw,
  902 N.E.2d 401 (Mass. 2009) ................................................................ 18

Phelps v. McClellan,
  30 F.3d 658 (6th Cir. 1994) ................................................................... 30

Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church,
  393 U.S. 440 (1969) ............................................................... 9, 13, 14

Robbins v. Oklahoma,
  519 F.3d 1242 (10th Cir. 2008) ............................................................. 25

Russell Packard Dev. v. Carson,
  108 P.3d 741 (Utah 2005) .............................................................. 31, 34

Security Sys. v. Alder Holdings,
  421 F. Supp. 3d 1186 (D. Utah 2019) ................................................... 35

Serbian E. Orthodox Diocese v. Milivojevich,
  426 U.S. 696 (1976) ................................................................. 9, 13, 16

Shepard v. Holmes,
  345 P.3d 786 (Wash. App. 2014) .......................................................... 31

Siebach v. Brigham Young Univ.,
  361 P.3d 130 (Utah App. 2015) ...................................................... 19, 20

Sierra Club v. Okla. Gas & Elec.,
  816 F.3d 666 (10th Cir. 2016) ............................................................... 30

Sterlin v. Biomune Sys.,
  154 F.3d 1191 (10th Cir. 1998) ............................................................. 32

Stone v. Salt Lake City,
  356 P.2d 631 (Utah 1960) .......................................................... 4, 8, 21, 23

Sumsion v. Bay Harbor Farm,
  427 P.3d 511 (Utah App. 2018) ............................................................ 35

TransUnion v. Ramirez,
  594 U.S. 413 (2021) ...................................................................... 15, 22

**Page(s)**

U.S. ex rel. Barrick v. Parker-Migliorini Int'l,
  2015 WL 9412537 (D. Utah 2015) ........................................................................ 21

U.S. v. Ballard,
  322 U.S. 78 (1944) .................................................................................................. 26

U.S. v. Rasheed,
  663 F.2d 843 (9th Cir. 1981), cert denied, 454 U.S. 1157 (1982) ........................ 14

United Klans v. McGovern,
  621 F.2d 152 (5th Cir. 1980) ................................................................................. 32

Utah Gospel Mission v. Salt Lake City Corp.,
  425 F.3d 1249 (10th Cir. 2005) ............................................................................... 5

Vera v. REL-BC,
  66 Cal. App. 5th 57 (Cal. Ct. App. 2021) ............................................................. 31

Waddoups v. Amalgamated Sugar,
  54 P.3d 1054 (Utah 2002) ........................................................................................ 8

Watson v. Jones,
  80 U.S. 679 (1871) ............................................................................................. 9, 16

Webster v. JP Morgan,
  290 P.3d 930 (Utah App. 2012) ............................................................................. 20

Wolter v. Delgatto,
  2006 WL 664214 (Tex. App. 2006) ....................................................................... 11

Yazd v. Woodside Homes,
  143 P.3d 283 (Utah 2006) ...................................................................................... 28

Youngblood v. Auto-Owners Ins.,
  158 P.3d 1088 (Utah 2007) .................................................................................... 28

## STATUTES

26 U.S.C. § 501 ........................................................................................................... 7

735 ILCS 5/13-205 .................................................................................................... 31

735 ILCS 5/13-210 .................................................................................................... 30

Cal. Code Civ. Proc. § 338 ....................................................................................... 31

Cal. Code Civ. Proc. § 361 ....................................................................................... 30

RCW 4.16.080 ........................................................................................................... 31

**Page(s)**

RCW 4.18.20 ........................................................................................................... 31

Tenn. Stat. § 28-1-112 ........................................................................................... 31

Tenn. Stat. § 28-3-105 ........................................................................................... 31

Utah Code § 13-22-23 ............................................................................................ 19

Utah Code § 51-8-301 .............................................................................................. 7

Utah Code § 78B-2-103 .......................................................................................... 31

Utah Code § 78B-2-305 .................................................................................... 31, 35

Utah Code § 78B-2-307 .......................................................................................... 35

## OTHER AUTHORITIES

Caring for Those in Need 2022 Annual Report, The Church of Jesus Christ of Latter-
day Saints,
https://assets.churchofjesuschrist.org/e1/cd/e1cd71b7b39511edbbe0eeeeac1eab7e449
42d10/welfare_caring_for_those_in_need_2022_annual_report.pdf ............................................ 7

Caring for Those in Need 2023 Annual Report, The Church of Jesus Christ of Latter-
day Saints,
https://assets.churchofjesuschrist.org/8b/36/8b360e21d69911ee9ebbeeeeac1e4fbbd8af
5f11/welfare_2023_annual_report_caring_for_those_in_need.pdf ............................................ 7

David Van Biema, Kingdom Come, Time (Aug. 4, 1997),
https://time.com/archive/6731237/kingdom-come-2/ ............................................................. 21

Doctrine and Covenants § 1,
https://www.churchofjesuschrist.org/study/scriptures/dc-testament/dc/1?lang=eng .................. 1

Doctrine and Covenants § 119:4,
https://www.churchofjesuschrist.org/study/scriptures/dc-testament/dc/119?lang=eng .............. 3

Doctrine and Covenants § 120,
https://www.churchofjesuschrist.org/study/scriptures/dc-testament/dc/120?lang=eng .............. 3

Doctrine and Covenants § 64,
https://www.churchofjesuschrist.org/study/scriptures/dc-testament/dc/64?lang=eng .......... 3, 28

Doctrine and Covenants § 65:2,
https://www.churchofjesuschrist.org/study/scriptures/dc-testament/dc/65?lang=eng ................ 1

Doctrine and Covenants § 97,
https://www.churchofjesuschrist.org/study/scriptures/dc-testament/dc/97?lang=eng .............. 29

**Page(s)**

First Presidency of The Church of Jesus Christ Announces New Medical School for
   Brigham Young University (July 29, 2024),
   https://newsroom.churchofjesuschrist.org/article/first-presidency-of-the-church-of-
   jesus-christ-announces-new-medical-school-for-brigham-young-university ............................ 7

First Presidency Statement on Church Finances (Dec. 17, 2019),
   https://newsroom.churchofjesuschrist.org/article/first-presidency-statement-church-
   finances ............................................................................................................................... 5

Gordon B. Hinckley, The State of the Church (Apr. 1991),
   https://www.churchofjesuschrist.org/study/general-conference/1991/04/the-state-of-
   the-church?lang=eng ........................................................................................................... 21

Gordon B. Hinckley, The State of the Church (Oct. 2003),
   https://www.churchofjesuschrist.org/study/general-conference/2003/10/the-state-of-
   the-church?lang=eng ............................................................................................................. 1

Ian Lovett and Rachael Levy, The Mormon Church Amassed $100 Billion.  It Was the
   Best-Kept Secret in the Investment World (Feb. 8, 2020),
   https://www.wsj.com/articles/the-mormon-church-amassed-100-billion-it-was-the-
   best-kept-secret-in-the-investment-world-11581138011 ................................................. 32, 33

Kathleen Flake, Mormonism and its Money, University of Virginia (Morman Studies),
   https://mormonstudies.as.virginia.edu/mormonism-and-its-money/ ...................................... 4, 5

Letter To An IRS Director,
   https://www.scribd.com/document/439385879/Letter-to-an-IRS-Director ....................... 32, 33

Malachi 3:10,
   https://www.biblegateway.com/passage/?search=Malachi%203%3A10&version=NIV .......... 3

Malachi 3:8,
   https://www.biblegateway.com/passage/?search=Malachi%203%3A8&version=KJV ............. 3

Matthew 25:20-21,
   https://www.biblegateway.com/passage/?search=Matthew%2025%3A20-
   21&version=NKJV ............................................................................................................... 19

Peggy Fletcher Stack, LDS Church Kept The Lid On Its $100 Billion Fund For Fear
   Tithing Receipts Would Fall, Account Boss Tells Wall Street Journal (Feb. 8, 2020),
   https://www.sltrib.com/news/2020/02/08/lds-church-kept-lid-its-b/ ................................. 32, 33

Russell M. Nelson, The Future of the Church: Preparing the World for the Savior's
   Second Coming (April 2020),
   https://www.churchofjesuschrist.org/study/ensign/2020/04/the-future-of-the-church-
   preparing-the-world-for-the-saviors-second-coming?lang=eng.................................................. 2

Slush Fund, Cambridge Dictionary,
   https://dictionary.cambridge.org/us/dictionary/english/slush-fund ............................................ 5

**Page(s)**

Tad Walch, <u>In CBS's '60 Minutes' Segment On Church Finances, It Missed The Sweeping Rags-To-Riches History Of Faith</u>, Deseret News (June 19, 2023), https://www.deseret.com/faith/2023/5/14/23649253/cbs-60-minutes-mormon-lds-church-finance-story-what-it-missed/ ........................................................................ 7

<u>Teachings of Presidents of the Church: Joseph Smith</u>, Chapter 11 (2007), https://www.churchofjesuschrist.org/study/manual/teachings-joseph-smith?lang=eng ............. 1

V. Schwartz, <u>et al.</u>, <u>The Church Autonomy Doctrine</u>, 80 U. Cin. L. Rev. 431 (2011) ........................................................................ 14

**RULES**

Fed. R. Civ. P. 12 ........................................................................ 1, 17, 25, 27

Fed. R. Civ. P. 15 ........................................................................ 36

Fed. R. Civ. P. 9 ........................................................................ 1, 6, 17, 21, 25, 27

Fed. R. Evid. 901 ........................................................................ 33

**TREATISES**

1 Religious Organizations and the Law § 8:26 (2d ed.) ........................................................................ 8

1 Religious Organizations and the Law § 8:27 (2d ed.) ........................................................................ 8

Restatement of the Law, <u>Charitable Nonprofit Organizations</u> § 2.02 ........................................................................ 19

Restatement of the Law, <u>Charitable Nonprofit Organizations</u> § 2.04 ........................................................................ 7, 19

**REGULATIONS**

Treas. Reg. § 1.501 ........................................................................ 7

## RELIEF REQUESTED

The Church of Jesus Christ of Latter-day Saints (the "Church") moves under Federal Rules of Civil Procedure 9(b) and 12(b)(6) to dismiss with prejudice the Consolidated Class Action Complaint (MDL Dkt. 63) ("Consolidated Complaint" or "Consol. Compl.").

## INTRODUCTION

The Church of Jesus Christ of Latter-day Saints is a worldwide Christian church with a growing membership of over 17 million in over 160 countries. Founded in 1830 by the Prophet Joseph Smith following a remarkable theophany, a key element of Church doctrine and the religious identity of its members has always been a divine mandate to take the gospel message worldwide. "For verily the voice of the Lord is unto all men," the very first section of the Church's Doctrine and Covenants states, "and there is no eye that shall not see, neither ear that shall not hear, neither heart that shall not be penetrated." Doctrine and Covenants § 1:2. "And the voice of warning shall be unto all people, by the mouths of my disciples, whom I have chosen in these last days…. for I the Lord have commanded them." Id. § 1:4-5. Another section of Church scripture prophesies that "the gospel [shall] roll forth unto the ends of the earth… until it has filled the whole earth." Id. § 65:2. In 1834, when the Church had a relative handful of members clustered in the backwaters of rural America, Joseph Smith boldly prophesied that "this Church will fill North and South America—it will fill the world." Teachings of Presidents of the Church: Joseph Smith, Ch. 11 at 137 (2007).

Joseph Smith's successors have reiterated his prophetic vision for the Church. "We have scarcely scratched the surface," Church President Gordon B. Hinckley said in 2003. "We are engaged in a work for the souls of men and women everywhere. Our work knows no boundaries. Under the providence of the Lord it will continue. Those nations now closed to us will someday be open… [The Church] is rolling forth to fill the earth." Gordon B. Hinckley, The State of the Church (Oct. 2003) at 7. Current Church President Russell M. Nelson has declared that the Church

has an "unparalleled future," and "as the Prophet Joseph Smith proclaimed—the restored gospel of Jesus Christ 'will go forth boldly, nobly, and independent, till it has penetrated every continent, visited every clime, swept every country, and sounded in every ear, till the purposes of God shall be accomplished, and the Great Jehovah shall say the work is done.'"  Russell M. Nelson, The Future of the Church: Preparing the World for the Savior's Second Coming (April 2020).

This prophetic vision of the Church's future and the Church's ambitious mission to spread its Christian witness to the whole world—and, as an integral part of that, to provide chapels, temples, pastoral support, relief from poverty, children and youth programs, educational opportunities and everything else associated with its religion and to do so for millions upon millions of people in every nation of the earth—animates its ecclesiastical leaders and faithful members now more than ever.  With over 8 billion people in the world, it is fair to say the Church believes it is just getting started.  Of course, some might say this mission is unreasonable or even foolish, but that is certainly not for the law to decide.  Again, this is a matter of Church doctrine.

Fulfilling this vision and mandate is the Church's only motivation for saving and investing a portion of the donations it receives for future use.  And how much will that cost?  How much is reasonable for the Church to save and invest to carry out this worldwide prophetic vision at the heart of its religion, including among the most impoverished people of the earth?  How should the Church spend its resources and the tithes of its faithful members to advance this religious mission over the next 10, 20, 50, 100 years and beyond?  How specifically or broadly should Church leaders describe the details and timing of how this mission will be carried out as they urge members to support it through the Biblical practice of tithing?  These are purely religious and ecclesiastical questions that under the United States Constitution, civil judges and juries cannot answer or even probe.  Yet that is exactly what this litigation demands, not only on Plaintiffs' behalf but also on

behalf of millions of members of the Church in the United States who are themselves faithful Church members devoted to the mission of the Church.

To be clear, with its bald assertion that the Church's financial reserves are too large, Plaintiffs' lawsuit is nothing less than a frontal assault on the Church's doctrine and the right of its ecclesiastical leaders to discern how God wants the Church to carry out its mission.  As demonstrated below, whether couched as fraud or any of their other tenuous claims, the First Amendment bars Plaintiffs' causes of action and their requested relief.

\* \* \* \*

In 2019, a self-styled "whistleblower" published an "exposé" he called "Letter to an IRS Director" that kindled controversy over the Church's finances.[1]  The crux of the IRS Letter was that the Church's reserve fund was too big and too secret.  Plaintiffs base their claims on this letter.

As revealed to the Prophet Joseph Smith, tithing is a sacrificial offering to God with associated blessings.  See Doctrine and Covenants § 64:10.  God commands Church members to give "one-tenth of all their interest annually."  Id. § 119:4.  To disobey the law of tithing is to "rob God."  Malachi 3:8.  God promises those who are obedient to this law that He will "open you the windows of heaven, and pour you out a blessing" so great "that there shall not be room enough to receive it."  Malachi 3:10.  The Lord has declared that decisions about how tithing is used are made "by a council, composed of the First Presidency of my Church" and other senior Church leaders according to "my own voice unto them, saith the Lord."  Doctrine and Covenants § 120.

As once devout believers, Plaintiffs faithfully gave tithes.  Now they want those alms back, claiming they gave under a "false understanding."  Consol. Compl. ¶ 133.  Plaintiffs cloak their claims in the language of fraud, but they are nothing like the oft-publicized cases where a minister

---

[1] The Consolidated Complaint repeatedly relies on and cites to the IRS Letter, making the IRS Letter subject to judicial notice.  See Broker's Choice v. NBC, 861 F.3d 1081, 1103-04 (10th Cir. 2017).

fleeces the flock to line his own pockets.  Like the IRS Letter, Plaintiffs allege only that the Church

is <u>saving</u> too much and doing so in secret.  As one historian wrote in response to the IRS Letter:

> [I]t is important to note, as does *Forbes'* Peter J. Reilly, "Most financial scandals
> involving churches involve the people running them looting them, not the church
> saving up too much money.  There is nothing… that indicates that LDS leadership
> is enriching itself."  Indeed… there has been a remarkable lack of financial scandal
> in [T]he Church of Jesus Christ of Latter-day Saints.[2]

The "critical material fact," Plaintiffs say, is that a "portion of donations made to [the Church] are

not applied to" religion and charity but are, instead, placed in the Church's reserves and invested

for future use.  Consol. Compl. ¶¶ 47-48.  Plaintiffs contend they "did not believe and had no

reason to ever suspect that [the Church] would take any portion of their donations and invest it."

<u>Id.</u> ¶ 132.

But Plaintiffs identify no fraud.  Having and investing reserve funds is not fraud.  The Utah

Supreme Court long ago rejected a nearly identical claim, pointing out that it is "common sense"

and "common knowledge" that "all of the funds the Church collects would <u>not</u> be disbursed

<u>immediately</u>," but some would be invested for future use.  <u>Stone v. Salt Lake City</u>, 356 P.2d 631,

633-34 (Utah 1960).  And "Plaintiffs cannot show that a legal duty exists between the Church and

its members requiring disclosure of material financial information."  <u>Gaddy v. Church</u>, 665 F.

Supp. 3d 1263, 1291 (D. Utah 2023) ("<u>Gaddy III</u>").  Thus, Plaintiffs' Consolidated Complaint,

while full of pejorative rhetoric about "hoarding" and "secrecy," does not plead fraud or any other

valid claim.

Plaintiffs simply object to the Church's reserve fund: (1) its size; (2) how it is invested;

(3) the duration of such investments; and (4) the extent of disclosure.  Such claims are, however,

not justiciable.  Nothing is more firmly fixed in First Amendment jurisprudence than a church's

right to "decide for [itself], free from state interference, matters of church government as well as

those of faith and doctrine."  <u>Hosanna-Tabor v. EEOC</u>, 565 U.S. 171, 186 (2012).  Whether the

---

[2] Kathleen Flake, <span style="color:blue">Mormonism and its Money</span>, University of Virginia (Morman Studies) .

Church is "hoarding" or wisely preparing for the future depends on one's vision of the Church's future and faith in its teachings and leaders. Plaintiffs' accusations are not ultimately about malfeasance; they are "about competing views of what should be done with Church money and who gets to say so."[3] But the First Amendment resolves that power struggle by giving churches "autonomy in making decisions regarding their own internal affairs." Bryce v. Episcopal Church, 289 F.3d 648, 655 (10th Cir. 2002).

Plaintiffs' claims are also time-barred. They are based entirely on the IRS Letter, which was published in December 2019—more than three years before any of the Plaintiffs filed suit. The Court should, therefore, dismiss Plaintiffs' claims with prejudice.

## PLAINTIFFS' ALLEGATIONS

In response to the IRS Letter, the Church's First Presidency explained: "Over many years" the Church has "methodically safeguarded" a portion of the donations it receives "through wise financial management and the building of a prudent reserve for the future."[4] This practice is based on the "sound doctrinal and financial principle taught by the Savior in the Parable of the Talents." Whether used immediately or invested for future use, "[a]ll Church funds exist for no other reason than to support the Church's divinely appointed mission."

More than three years later, Plaintiffs raise objections to the size of the Church's reserve fund, pejoratively calling it a "slush fund"[5] and "large-scale hoarding." Consol. Compl. ¶¶ 1, 2, 91. They object to the Church owning as investments "a significant number of for-profit and non-profit entities." Id. ¶¶ 2, 9, 39, 66. According to Plaintiffs, these investments "serve no charitable purpose at all or are even commercial in nature." Id. ¶ 66. Plaintiffs further contend that the

---

[3] Flake, supra n.2.

[4] Plaintiffs' pleading relies on and links to First Presidency Statement on Church Finances (Consol. Compl. ¶ 12 n.4), making that also subject to judicial notice. See Utah Gospel Mission v. Salt Lake City Corp., 425 F.3d 1249, 1253-54 (10th Cir. 2005).

[5] A "slush fund" is money "kept for dishonest or illegal activities in politics or business." Slush Fund, Cambridge Dictionary. Plaintiffs make no allegations justifying this characterization.

Church should use donations "immediately" and should be less secret about its finances. Id. ¶¶ 1, 3, 10, 15, 84, 91, 92, 133, 152, 156. Plaintiffs likewise allege that they "did not believe and had no reason to ever suspect that [the Church] would take any portion of their donations and invest it into Ensign…." Id. ¶ 132.

Too little and too late, Plaintiffs attempt to plead five claims: (1) breach of fiduciary duty; (2) fraudulent inducement; (3) fraudulent concealment; (4) fraudulent misrepresentation; and (5) unjust enrichment. Each claim will be addressed individually in Section III. None has merit.

## LEGAL STANDARD

Plaintiffs must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While the Court must accept as true all well-pled factual allegations, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. And for fraud allegations in particular, under the heightened pleading standards of Fed. R. Civ. P. 9(b), Plaintiffs must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." Koch v. Koch Indus., 203 F.3d 1202, 1236 (10th Cir. 2000).

## ARGUMENT[6]

Plaintiffs' claims are barred by the Church Autonomy Doctrine and by the statute of limitations. Beyond that, Plaintiffs simply fail to plead viable claims. But before addressing these issues, the Church will clear some brush by correcting misconceptions about how churches and charities operate, many of which find their way into Plaintiffs' Consolidated Complaint.

---

[6] Unless otherwise stated, all emphasis is supplied, and all internal citations and quotations are omitted from all material quoted herein.

I. **THE CHURCH MANAGES ITS FINANCES IN COMPLIANCE WITH THE LAWS AND REGULATIONS GOVERNING CHURCHES AND OTHER CHARITIES**

As a Section 501(c)(3) nonprofit, the Church: (1) must be operated exclusively for <u>religious</u> or other charitable purposes; and (2) earnings may not inure to the benefit of any private individual. <u>See</u> 26 U.S.C. § 501(c)(3). Plaintiffs make no allegation of private inurement, nor could they credibly do so. They focus instead on whether Church activities are sufficiently charitable.

Some mistakenly believe "charitable" means only helping the poor and needy.[7] But the "advancement of religion" is also charity. <u>See</u> Treas. Reg. § 1.501(c)(3)-1(d)(2). Donations spent on day-to-day Church operations, building and maintaining chapels and temples, funding missionary work and funding education, for example, <u>are charity</u>.[8] And to support such activities, charities are unquestionably permitted to "accumulate" a reserve fund and manage those funds "as a prudent investor would in light of the purposes of the charity." Restatement of the Law, <u>Charitable Nonprofit Organizations</u> § 2.04. Indeed, "[a] charity often holds substantial assets that are meant to be invested for the continuing operation of the charity to advance its purposes." <u>Id.</u> comment a. The Uniform Prudent Management of Institutional Funds Act, adopted by every state except Pennsylvania, expressly authorizes charities to accumulate assets and invest. <u>See</u> Utah Code § 51-8-301(1)(a).

Plaintiffs nevertheless object to the Church investing in "noncharitable activities" and owning as <u>investments</u> "for-profit" businesses. Consol. Compl. ¶¶ 39, 155, 163, 172. But there is nothing improper about this. "Nonprofit does not mean that the organization itself cannot make a

---

[7] The Church spent over $1 billion in both 2022 and 2023 caring for those in need. <u>See</u> Caring for Those in Need 2022 Annual Report at 4; Caring for Those in Need 2023 Annual Report at 14 (So that Plaintiffs' allegations do not go completely unrefuted, the Church refers in Footnotes 7, 8 and 17 to matters outside the pleadings. The Court can, however, ignore those footnotes as it sees fit.)

[8] The Church spends over $1 billion annually on its education system and just announced it would open a medical school at BYU to focus on the needs of Church members in developing countries as part of "the Church's worldwide humanitarian efforts." <u>See</u> First Presidency of The Church of Jesus Christ Announces New Medical School for Brigham Young University (July 29, 2024).

profit," the "essence of the nonprofit test under § 501(c)(3)" is its "prohibition against private inurement." 1 Religious Organizations and the Law § 8:26 n.4 (2d ed.). "[R]eligious organizations" can "own and operate taxable businesses, either for <u>investment</u> purposes or because the businesses are closely aligned with their religious missions" or both. <u>Id.</u> § 8.27.

Plaintiffs are not the first to object to Church investments. In <u>Stone</u>, a Church member objected to the Church's investment in a Salt Lake City mall—City Creek's predecessor—saying (much like Plaintiffs here) that "funds collected by the Church must be used for religious and charitable purposes," not for investments in for-profit pursuits. <u>Stone</u>, 356 P.2d at 633. The Utah Supreme Court said of course donations must "<u>ultimately</u> be applied to the purposes for which the [Church] exists and for which the funds were donated," but "it is obvious that all of the funds the Church collects would <u>not</u> be disbursed <u>immediately</u> and directly for such purposes." <u>Id.</u> at 633-34. "It is but common sense and common knowledge," the Utah Supreme Court continued, "that there is need for the exercise of <u>management</u> of such funds for the <u>ultimate accomplishment</u> of the purposes stated." <u>Id.</u> at 634. "How this is to be done to <u>best</u> serve those objectives is for those in charge of the management of the church to decide" and may "entail the keeping of collected funds in savings accounts, bonds, real estate or any type of <u>investment</u> in which, in the <u>judgment</u> of those in charge, best suits that purpose." <u>Id.</u> Moreover, a donor "has no right to retrieve, control, or direct the manner in which the money so given shall be used simply because he has made such contributions." <u>Id.</u>[9]

The Church manages its finances consistent with Church doctrine, sacred revelation and Church teachings, and it does so wisely in order to ensure its continuing ability to carry out what the Church believes to be its divinely appointed mission. Thus, <u>investment</u> of funds is not a <u>misuse</u>

---

[9] Utah law governs Plaintiffs' claims, because Utah has the most significant relationship to the claims. <u>See</u>, <u>e.g.</u>, <u>Waddoups v. Amalgamated Sugar</u>, 54 P.3d 1054, 1059 (Utah 2002); <u>see</u> <u>also</u> disc. <u>infra</u> at § IV.A. Plaintiffs appear to agree. <u>See</u>, <u>e.g.</u>, Consol. Compl. ¶ 14 (claiming Plaintiffs "are entitled to money damages and injunctive relief under Utah law").

or <u>diversion</u> of funds from the Church's mission; it <u>increases</u> the funds available for that mission now and into the future.

## II.    THE CHURCH AUTONOMY DOCTRINE BARS PLAINTIFFS' CLAIMS

"[T]he First Amendment severely circumscribes the role that civil courts may play in resolving" disputes "over church polity and church administration." <u>Serbian E. Orthodox Diocese v. Milivojevich</u>, 426 U.S. 696, 709-10 (1976). This is because the First Amendment gives churches "<u>autonomy</u> in making decisions regarding their own internal affairs." <u>Bryce</u>, 289 F.3d at 655. "This church autonomy doctrine," rooted in a "long line of Supreme Court cases" dating back at least to <u>Watson v. Jones</u>, 80 U.S. 679, 728-29 (1871), "<u>prohibits</u> civil court review of internal church disputes involving matters of faith, doctrine, church governance, and polity." <u>Id.</u>

Recent Supreme Court decisions have only reaffirmed and fortified the Church Autonomy Doctrine. In <u>Our Lady of Guadalupe Sch. v. Morrissey-Berru</u>, 591 U.S. 732, 737 (2020), for example, the Supreme Court reiterated that "[t]he First Amendment protects the right of religious institutions to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine" and gives churches "independence in matters of faith and doctrine and in closely linked matters of internal government." <u>Id.</u> at 747. This "leaves the civil courts <u>no</u> role in determining ecclesiastical questions," because doing so would unconstitutionally "inject [them] into substantive ecclesiastical matters." <u>Presb. Church v. Mary Elizabeth Blue Hull Mem'l Presb. Church</u>, 393 U.S. 440, 447, 451 (1969).

### A.    The Church Autonomy Doctrine Bars Suits Over Control Of Church Finances

Applying these long-established principles, courts have repeatedly held that the Church Autonomy Doctrine bars lawsuits challenging how churches "expend funds raised by the church," because such decisions "fall[] within the ecclesiastical sphere that the First Amendment protects from civil court intervention." <u>Bell v. Presb. Church</u>, 126 F.3d 328, 332-33 (4th Cir. 1997). In

Bell, the plaintiff argued that church leaders were misusing church funds, while church leaders insisted they were "acting in good faith to fulfill [their] discernment of the divine will for its ministry." Id. Resolving that dispute, the court in Bell said "would interpose the judiciary into" how the church should "expend funds raised by the church for religious purposes," which the First Amendment prohibits. Id.

Here, Plaintiffs do not (and cannot) plead that Church leaders have been motivated by anything but a good faith effort "to fulfill [their] discernment of the divine will for [the Church's] ministry." Bell, 126 F.3d at 332. Church leaders have no other conceivable motive. Plaintiffs make no accusation of personal enrichment or greed, nor could any such accusation be credibly made.

In Bible Way Church v. Beards, 680 A.2d 419 (D.C. App. 1996), a case with many similarities to this one, the plaintiffs filed a putative class action against their church. They alleged "that Bible Way had violated a duty of care owed to its members" and accused church leaders of "failing to comply with Social Security and other federal, as well as local, tax laws; failing to separate the church's religious operations from 'purely secular' activities such as a day care center, apartment complex, and supermarket;… failing to provide annual financial reports to the members." Id. at 424. The plaintiffs "requested an accounting" of money held for the benefit of the church and demanded that a receiver be appointed to take control of church assets. Id.

The church in Bible Way argued "that the claim would entangle the trial court in matters of 'internal church governance.'" Id. at 425. Applying the Church Autonomy Doctrine, the court in Bible Way then asked whether the plaintiffs' claims could be decided "consistent with the Constitution" by applying purely "secular" standards and without "involv[ing] the court in resolving a dispute with doctrinal implications." Id. at 427-28. "Theoretically," the court reasoned, a dispute over church funds could be resolved by a court if there were some "universal"

standard applicable to all churches.  But "[t]he possibility of universal, indisputable accounting and reporting criteria for all churches is almost self-evidently contrary to reason."  Id. at 429-30. Every church has its own financial practices and priorities based on its beliefs.  And because "a church's financial regime, including any required reports to members, necessarily reflects an array of decisions about a member's obligation to pledge funds, and about the leaders' corresponding responsibility to account for those funds,… a civil court cannot arbitrate" such a dispute "without entangling itself in doctrinal interpretations."  Id. at 429.  Resolving the plaintiffs' claims would require answering questions like: "What should be the collection, tithing, or offering practices of the church?" "What cash management and investment decisions should be made?" "Who in the church establishes spending priorities?"  Id.  But civil courts simply cannot answer such questions without intruding on the Free Exercise Clause and the Establishment Clause of the First Amendment.  Id.

Here, resolving Plaintiffs' claims would require the Court to answer similar questions: Should the Church use all donations immediately or should it have a reserve fund?  How large should the reserve fund be?  How should the Church invest its reserve fund?  How much financial information should the Church provide its members?  Just as in Bible Way, answering such questions would unconstitutionally inject the Court into ecclesiastical matters.

Numerous other cases have reached the same conclusion.  In Wolter v. Delgatto, 2006 WL 664214 (Tex. App. 2006), for example, the court dismissed a claim that a church misapplied funds to a development project, because questions about "how and when [the church] may spend its resources" are "ecclesiastical in nature."  Id. *2.  In Ambellu v. Re'ese Adbarat, 387 F. Supp. 3d 71, 80 (D.D.C. 2019), a church faction alleged that church leaders "engaged in conversion of [] contributions by depriving the Parishioners of their right to vote on how the monies are used."  The court dismissed that case, because the First Amendment requires courts to avoid "interference with

the Church's ability to make governance and spending decisions." Id. "How a church spends worshippers' contributions is… central to the exercise of religion." Id.

The court in In re Godwin, 293 S.W.3d 742 (Tex. App. 2009), refused to adjudicate the plaintiff's claim that church leaders "were poor stewards of church funds and failed to use the church's resources for 'good church purposes,'" because it would "require an inquiry into whether the expenditures were justified in light of [the church's] religious doctrine and practices." Id. at 750. Such an exercise is "the type of ecclesiastical inquiry courts are forbidden to make…." Id.

In Harris v. Matthews, 643 S.E.2d 566 (N.C. 2007), the court rejected claims by plaintiffs who believed that church funds had been misappropriated by church leaders. "Determining whether… expenditures… were proper" would "require[] an examination of the role of the… church leaders" including "their authority" over church finances and because "a church's religious doctrine and practice affect its understanding of each of these concepts," "seeking a court's review" would be "no different than asking a court to determine whether a particular church's grounds for membership are spiritually or doctrinally correct or whether a church's charitable pursuits accord with the congregation's beliefs." Id. at 571. This is "precisely the type of ecclesiastical inquiry courts are forbidden to make." Id.; see also Heritage Vill. Church v. State, 263 S.E.2d 726, 735-36 (N.C. 1980) (explaining that a court cannot adjudicate whether a church spends "an unreasonable percentage" of its funds for other than "a charitable purpose," because "the propriety of a religious organizations' expenditures can be evaluated only by reference to the religious organization's own doctrinal goals and procedures").[10]

---

[10] See also, e.g., Alpine Meth. Episc. Church v. N.J. United Meth. Church, 2017 WL 6492523, *9 (N.J. Sup. Ct. 2017) (resolving whether reverend misused funds "would require the court to consider, under the UMC's doctrine and polity… the pastor's role and authority over the Church's finances"); El Pescador Church v. Ferrero, 594 S.W.3d 645, 658 (Tex. App. 2019) (rejecting fraud-based tithing claim as "necessarily embroil[ing] the courts into… church governance matters").

Here, as in each preceding case, Plaintiffs accuse the Church of misusing donations, because some donations "are not used for any religious or charitable purpose, but rather are diverted to non-charitable investments." Consol. Compl. ¶ 48. That is not a justiciable claim. The "church's financial regime… reflects an array of decisions" made by duly-appointed Church leaders, under the direction of the Lord, about the religious obligation of members to give tithes and Church leaders' responsibility for those tithes and their accountability to God. The Court cannot adjudicate such a dispute "without entangling itself in doctrinal interpretations." Bible Way, 680 A.2d at 429.

The Church maintains a reserve fund for many religious and doctrinal reasons, including to sustain its worldwide growth (occurring mostly in countries that consume more tithing than they contribute), ever-increasing humanitarian efforts and out of sincere religious beliefs about the Church's prophesied future. People outside the faith may not understand or agree with those beliefs, but that is irrelevant to the First Amendment inquiry. "[I]t is the essence of religious faith that ecclesiastical decisions are reached and are to be accepted as matters of faith whether or not rational or measurable by objective criteria." Serbian E. Orthodox, 426 U.S. at 714-15. Some decisions, "though perhaps difficult for a person not intimately familiar with the religion to understand, are perfectly sensible—and perhaps even necessary—in the eyes of the faithful." Fratello v. Archdiocese of N.Y., 863 F.3d 190, 203 (2d Cir. 2017).

Plaintiffs depart from any subtlety when they plead that the Church has used donations "in manners antithetical to the purported mission of" the Church. Consol. Compl. ¶ 132. This reeks of the "departure-from-doctrine" test the Supreme Court rejected in Presbyterian Church, 393 U.S. 442. Such claims "require the civil court to determine" whether a practice is antithetical to church doctrine. Id. at 451. "Plainly the First Amendment forbids civil courts from playing such a role." Id. at 450. A court can no more determine whether a financial decision was "antithetical to the

purported mission of" the Church than it can say what that mission should be in the first place. Doing so unconstitutionally "inject[s] the civil courts into substantive ecclesiastical matters." Id. at 450-51.

Plaintiffs will likely respond by contending that they are not challenging the Church's right to use donations as it chooses but that the Church cannot misrepresent or conceal how it uses donations. Fraud claims, however, evade church autonomy "only when the [alleged] misrepresentation is exclusively secular" and the claim is "not mixed with religious beliefs and claims." V. Schwartz, et al., The Church Autonomy Doctrine, 80 U. Cin. L. Rev. 431, 468 (2011). A fraud claim must present a "purely secular" dispute and cannot be "rooted in religious belief." Bryce, 289 F.3d at 657.[11]

As explained, this case presents anything but a "purely secular" dispute—it instead goes to the heart of what the Church believes its divinely appointed mission to be and what it may do with tithing and donated funds to fulfill that mission now and in the future. See disc. supra at pp. 1-3. Indeed, Plaintiffs admit that the "critical material fact[]," is that "a significant portion of donated monies are not used [immediately] for any religious or charitable purpose, but rather are diverted to non-charitable investments." Consol. Compl. ¶ 48. The key word there is "investment." To plead fraud, Plaintiffs would have to specifically allege (at a bare minimum) that the Church

---

[11] To be clear, the First Amendment does not allow churches to commit fraud. A pastor running a Ponzi scheme cannot escape prosecution by cloaking himself in religious garb. See U.S. v. Rasheed, 663 F.2d 843, 847 (9th Cir. 1981), cert denied, 454 U.S. 1157 (1982). Nor can a religious leader solicit funds for purposes of advancing the mission of a church but then use those funds for personal purposes (e.g., to perpetuate and cover up sexual abuse). See Carrier v. Ravi Zacharias Int'l Ministries, 2022 WL 1540206, *6 (N.D. Ga. 2022). Religious leaders cannot "'by chicanery, deceit, and fraud, divert the property of a church organization… for their own selfish benefit….'" Libhart v. Copeland, 949 S.W.2d 783, 794 (Tex. App. 1997). Such claims do raise "purely secular" disputes," but Plaintiffs allege nothing like this. They accuse the Church of saving and investing too much (i.e., "hoarding") and contend that such saving and investment is antithetical to the Church's mission (as Plaintiffs seek to define that mission). See Consol. Compl. ¶¶ 91, 99, 132. But that sort of claim cannot "be decided according to state statutes and common law principles." Carrier, 2022 WL 1540206, *6.

promised members it would "immediately" use <u>all</u> donations for "religious or charitable purposes" and not invest <u>any</u> portion for future use.  Plaintiffs do not (and cannot) identify any such promise.[12]  The closest they come is the First Presidency's statement that a "vast majority" of donations are "immediately" used to support the Church's mission.  <u>Id.</u> ¶ 133.  But as explained below, Plaintiffs do not plead that this statement is false, because it is not.[13]

The moment Plaintiffs acknowledge (as they must) that the Church can maintain a reserve fund, the remaining dispute is only about the size of that fund, how it is invested and how it should be used to support the Church's mission—matters at the heart of the Church Autonomy Doctrine and protected from civil court review.  For this reason alone the Consolidated Complaint should be dismissed in its entirety with prejudice.

**B.  The Church Autonomy Doctrine Protects A Church's Decisions About The Degree Of Financial Disclosure To Members**

Plaintiffs will also likely argue that their allegations concerning the alleged "conceal[ment] [of] the extent of Ensign's holdings" place this case outside the First Amendment's protections.  Consol. Compl. ¶ 3; <u>see also id.</u> ¶¶ 117, 119, 121, 123, 125, 127, 129, 131 (alleging that each Plaintiff was deceived in making donations "[b]ecause of Defendants' ongoing efforts to conceal from the public the nature and extent of the donations held by Ensign").  But the First Amendment

---

[12] Plaintiffs might point to the allegations concerning Church statements about humanitarian aid and the Church's Philanthropies that 100% of donations would be used for those programs as false and misleading statements.  <u>See, e.g.</u>, Consol. Compl. ¶¶ 61-70.  But even accepting those allegations as true, Plaintiffs again identify <u>no</u> Church statement that donations to humanitarian aid or Church Philanthropies would be used <u>immediately</u> or never invested and grown to sustain humanitarian aid and Church Philanthropies into the future, nor could they.  A dollar invested, grown and later spent on humanitarian aid is still a dollar spent on humanitarian aid.  Regardless, no Plaintiff alleges that he or she actually saw the alleged Church statements about humanitarian aid or Church Philanthropies or even donated to them, and therefore, no Plaintiff has standing to challenge donations to these programs.  <u>See</u> <u>TransUnion v. Ramirez</u>, 594 U.S. 413, 417 (2021) ("No concrete harm, no standing."); <u>id.</u> at 431 ("And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for <u>each</u> <u>claim</u> that they press and for <u>each</u> <u>form</u> <u>of</u> <u>relief</u> that they seek (for example, injunctive relief and damages).").

[13] Moreover, this statement was made in 2019 in response to the IRS Letter.

also precludes courts from dictating what financial disclosure churches owe their members. "[A] church's financial regime, including any required reports to members" cannot be adjudicated "without entangle[ment]… in doctrinal interpretations[.]" <u>Bible Way</u>, 680 A.2d at 429. Indeed, civil courts are <u>prohibited</u> from becoming "arbiters of the appropriate level of disclosure to the church's members in… matters of ecclesiastical fiscal administration." <u>Church of Scientology v. Clearwater</u>, 2 F.3d 1514, 1536 (11th Cir. 1993).

Instead, the First Amendment "mandate[s] that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church" on such matters. <u>Serbian E. Orthodox</u>, 426 U.S. at 709. If parishioners are "dissatisfied with the church's… disclosure policy then they may attempt to reform that policy from <u>within</u>, they may acquiesce in the policy despite their objections or they may <u>leave</u> the church." <u>Church of Scientology</u>, 2 F.3d at 1544. As the Supreme Court long ago explained, civil courts "cannot penetrate the veil of the church for the forbidden purpose of vindicating the alleged wrongs of… members; when they became members they did so upon the condition of continuing or not as they and their churches might determine, and they thereby submit to the ecclesiastical power and cannot now invoke the supervisory power of the civil tribunals." <u>Watson</u>, 80 U.S. at 731; <u>see also</u> <u>Kedroff v. St. Nicholas Cathedral</u>, 344 U.S. 94, 114 (1952) ("All who unite themselves to [a church] do so with an implied <u>consent</u> to [its] government, and are bound to submit to it. But it would be a vain consent and would lead to a total <u>subversion</u> of such religious bodies, if anyone aggrieved by one of their decisions could appeal to the <u>secular</u> courts and have them reversed.").

### C. Plaintiffs' Requested Relief Plainly Violates The Church Autonomy Doctrine

Plaintiffs' claims are finally laid to rest by the astonishing relief they request: <u>enjoining</u> the Church from investing; "<u>requiring</u> regular public accounting… as to the collection, use and disposition of collected funds"; and "<u>appointment</u> of a Special Master" to oversee the use of

collected funds.  Consol. Compl. ¶ 193.  This is the exact opposite of the First Amendment's promise that churches have "power to decide for themselves, <u>free</u> from state interference, matters of church government as well as those of faith and doctrine."  <u>Hosanna-Tabor</u>, 565 U.S. at 186.

For any and all of the reasons set forth above, the First Amendment's Church Autonomy Doctrine entirely bars Plaintiffs' sweeping, invasive challenge to Church finances.

## III.    PLAINTIFFS FAIL TO STATE A CLAIM

Church autonomy aside, Plaintiffs simply fail to plead actionable claims under Fed R. Civ. P. 9(b) and 12(b)(6).

### A.    Plaintiffs Fail To State A Claim For Breach Of Fiduciary Duty

Plaintiffs' first cause of action claims that the Church created a fiduciary duty with them by soliciting and accepting their donations and then breached that duty by failing "to fully disclose to them all material facts and information in connection with its disposition of donations" and "misusing the donations" by investing some of them.  Consol. Compl. ¶¶ 151-53.  "[B]reach of fiduciary duty claims require proof of four elements: '[1] the existence of a fiduciary relationship…; [2] breach of the fiduciary… duty; [3] causation, both actual and proximate; and [4] damages."  <u>Gaddy v. Church</u>, 451 F. Supp. 3d 1227, 1240 (D. Utah 2020) ("<u>Gaddy I</u>") (quoting <u>Gables at Sterling v. Castlewood-Sterling</u>, 417 P.3d 95, 109 (Utah 2018)).

#### 1.    The Church Does Not Owe Plaintiffs A Fiduciary Duty

This claim fails as a matter of law, because the Church did not owe Plaintiffs a fiduciary duty.  Plaintiffs allege two relationships with the Church: (1) membership; and (2) donor-donee. Neither is a fiduciary relationship.  This Court already held in <u>Gaddy I</u> that there is "no authority… establishing that a legally cognizable fiduciary duty arises from purely ecclesiastical relationships."  <u>Gaddy I</u>, 451 F. Supp. 3d at 1240.  Indeed, "the Utah Supreme Court has explicitly <u>declined</u> to recognize such a duty."  <u>Id.</u> (citing <u>Franco v. Church</u>, 21 P.3d 198, 205 (Utah 2001), <u>overturned on other grounds</u> <u>Williams v. Kingdom Hall</u>, 491 P.3d 852 (Utah 2021)); <u>see also</u>

Gaddy III, 665 F. Supp. 3d at 1292 ("Plaintiffs cite no case law… establishing or even suggesting that a legally cognizable fiduciary duty arises or could arise from ecclesiastical relationships."). In fact, no court has recognized a fiduciary relationship between a church and its members.  Church membership "do[es] not establish… the type of relationship… from which a fiduciary duty could possibly arise."  Petrell v. Shaw, 902 N.E.2d 401, 406 (Mass. 2009); see also Bryan R. v. Watchtower Bible, 738 A.2d 839, 846 (Me. 1999) ("[Plaintiff] has not provided any support for his assertion that a religious organization has a fiduciary relationship with its members….").

Moreover, the First Amendment prohibits imposing a fiduciary duty between churches and parishioners.  "Defining such a duty" would be "as impossible as it is unconstitutional…."  Franco, 21 P.3d at 206.  "[W]hen a parishioner lodges… a claim" for breach of fiduciary duty against his church, "religion is not merely incidental to a plaintiff's relationship with a defendant, it is the foundation for it."  Amato v. Greenquist, 679 N.E.2d 446, 454 (Ill. App. 1997).  It would be impossible to define such a duty "without resort to religious facts."  Langford v. Roman Cath. Diocese, 677 N.Y.S.2d 436, 439 (Sup. Ct. 1998), aff'd, 705 N.Y.S.2d 661 (App. Div. 2000).

Nor has any court held that donations create a fiduciary relationship between a donor and donee.  To the contrary, courts have repeatedly rejected that contention.  See, e.g., Jackson v. Educ. & Emp't Ministry, 686 Fed. Appx. 577, 581 (10th Cir. 2017) (plaintiffs "cite no authority to support finding a fiduciary relationship based on their status as either TEEM employees or donors"); Pearson Family Members Found. v. Univ. of Chi., 2018 WL 3214219, *10 (N.D. Okla. 2018) (rejecting plaintiff's claim of "fiduciary duty based on its 'donor-donee relationship' with the University").

Plaintiffs point to a provision in the Utah Charitable Solicitations Act:

"Every person soliciting, collecting, or expending contributions for charitable purposes, and every officer, director, trustee, or employee of any person concerned with the solicitation, collection, or expenditure of those contributions, shall be considered to be a fiduciary and acting in a fiduciary capacity."

Consol. Compl. ¶ 147 (quoting Utah Code § 13-22-23).  But contrary to Plaintiffs' suggestion, this provision does not say charities owe a fiduciary duty <u>to</u> <u>donors</u> (and no court has so held); rather, it recognizes that certain people owe a fiduciary duty <u>to the</u> <u>charity</u>.[14]  And this duty is to act "in the best interests of the charity in light of its purposes," which includes "manag[ing] [the charity's] assets that are held for investments as a prudent investor would in light of the purposes of the charity," which is precisely what Church leaders have done here.  Restatement of the Law, <u>Charitable Nonprofit Organization</u> §§ 2.02, 2.04.

### 2.    Plaintiffs Have Not Pled Any <u>Breach</u> Of An Alleged Fiduciary Duty

Even assuming the Church owed Plaintiffs a fiduciary duty, one must ask how it was breached?  A fiduciary's duty is "to act primarily for the benefit of another."  <u>First Sec. Bank v. Banberry Dev.</u>, 786 P.2d 1326, 1333 (Utah 1990).  Here, Plaintiffs have alleged that the Church took some portion of their donations and <u>increased</u> its assets—turning five "talents" into ten, thus <u>expanding</u> the Church's ability to fulfill the mission Plaintiffs once supported and donated to.  An appropriate response to such wise stewardship might have been, "Well done…."  Matthew 25:20-21.

### 3.    Plaintiffs Lack Standing To Pursue A Claim For Breach Of Fiduciary Duty

Fraud is the only legal theory that possibly gives Plaintiffs standing to sue over how the Church uses donations.  The common law has long recognized that a donor gives up all legal claim to a donation and, absent fraud, cannot sue to get it back.  But "only the attorney general, and not the donor, has standing to enforce the terms of a completed charitable gift."  <u>Siebach v. Brigham Young Univ.</u>, 361 P.3d 130, 135 (Utah App. 2015).  This is a widely accepted rule.[15]  Utah

---

[14] Also, "the UCSA does not create a private cause of action."  <u>Gaddy III</u>, 665 F. Supp. 3d at 1294.

[15] <u>See</u> <u>e.g.</u>, <u>Carl J. Herzog Found. v. Univ. of Bridgeport</u>, 699 A.2d 995, 998 (Conn. 1997) ("[T]he donor himself has no standing to enforce the terms of his gift when he has not retained a specific right to control the property…."); <u>Herbst v. Univ. of Colo.</u>, 513 P.3d 388, 391 (Colo. App. 2022) ("[A]t common law, only the Attorney General or a person with a special interest in a charitable trust has standing to sue for mismanagement."); <u>Courtenay C. & Lucy Patten Davis Found. v.</u>

<span style="text-align:right">(continued…)</span>

recognizes an exception for fraudulent inducement, because claims based on "the improper inducement of a charitable donation are distinguishable from claims seeking to enforce donative intent." Id. at 140. While it is questionable whether that exception applies to Plaintiffs' fraud claims, it clearly does not apply to Plaintiffs' fiduciary duty claim, thus depriving them of standing to pursue that claim.

### B.    Plaintiffs Fail To State A Claim For Fraudulent Inducement Or Fraudulent Misrepresentation

Plaintiffs' second cause of action accuses the Church of fraudulently inducing them to donate by promising:

a.    Donated funds would be directed towards charitable purposes,

b.    Funds donated to specific church organizations would be directed toward those organizations and used exclusively for charitable purposes,

c.    The "vast majority" of donated funds would be used for charitable purposes, and

d.    [The Church] followed all applicable laws regarding its use of donated funds.

Consol. Compl. ¶ 158.

Plaintiffs' fraudulent misrepresentation claim—the fourth cause of action—is based on assurances that no "tithing" would be used for City Creek. Id. ¶¶ 178-82. Both claims require the same nine elements:

> (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor (a) either knew to be false or (b) made recklessly knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to the party's injury and damage.

Gaddy I, 451 F. Supp. 3d at 1235 (quoting Webster v. JP Morgan, 290 P.3d 930, 936 (Utah App. 2012)); see also Crookston v. Fire Ins. Exch., 817 P.2d 789, 800 (Utah 1991). And both claims fail as a matter of law.

---

Colo. State Univ., 320 P.3d 1115, 1126 (Wyo. 2014) ("[A] donor ha[s] no standing to enforce the terms of a completed charitable gift unless the donor ha[s] expressly reserved a property interest in the gift.").

### 1.  Fraudulent Inducement (Count 2)—Plaintiffs Fail To Plead Falsity

Plaintiffs identify a few specific statements to support their fraudulent inducement claim but fail to plead that any of them is false.  Plaintiffs assert that the Church has "repeatedly declared in no uncertain terms that tithing funds are 'always used' for purposes like building construction, missionary work, education of Church members, and care for the poor and needy."  Consol. Compl. ¶ 54.  Although "always used" is in quotation marks, Plaintiffs do not identify a source.  Id.  Thus, at a minimum, this statement cannot satisfy Rule 9(b).  See, e.g., U.S. ex rel. Barrick v. Parker-Migliorini Int'l, 2015 WL 9412537, *4 (D. Utah 2015) (dismissing claim under Rule 9(b) where plaintiff failed to "identify the source of the false statement").  Plaintiffs also fail to plead that it is even false.  Plaintiffs' theory is that investing tithing for future use makes the statement false; but "always used" does not mean "always immediately used."  And investing and growing donations for future use is an appropriate way of using donated funds for their intended purpose.  See, e.g., Stone, 356 P.2d at 633-34.

Plaintiffs also refer to the 2019 First Presidency statement that the "vast majority" of donations are "used immediately" to further the Church's mission.  Consol. Compl. ¶¶ 133, 158.  Plaintiffs also fail to plead that this statement is false.  They plead that "some portion" of their donations were put into a reserve fund.  Id. ¶ 155.  But the Church has never said all tithing would be immediately expended, and Plaintiffs identify no such statement.[16]  Timing, not truthfulness, is the issue.

---

[16] To the contrary, Church leaders have publicly stated for decades that "a fixed percentage" would be "set aside to build reserves….'"  Gordon B. Hinckley, The State of the Church (Apr. 1991).  And the Church's significant investments have always been a matter of public knowledge.  Dozens of articles and books have been written about Church finances, all of which are subject to judicial notice.  One prominent example is the August 4, 1997, cover article of TIME magazine, which explained that the Church "employ[s] vast amounts of money in investments…."  David Van Biema, Kingdom Come, Time (Aug. 4, 1997).  "With unusual cooperation from the Latter-day Saints hierarchy (which provided some financial figures and a rare look at church businesses), TIME has been able to quantify the church's extraordinary financial vibrancy.  Its current assets total a minimum of $30 billion."  Id.

Plaintiffs point to a few other allegedly false statements, but each fails.  Plaintiffs plead three statements about fast offerings.  Consol. Compl. ¶¶ 5, 58, 59.  This one is representative:

> "On April 1, 2001, during the Church's bi-annual General Conference, Joseph B. Wirthlin, one of 15 of LDS's governing apostles, made the following representations regarding fast offerings: 'Fast offerings are used for one purpose only: to bless the lives of those in need.  Every dollar given to the bishop as a fast offering goes to assist the poor.  When donations exceed local needs, they are passed along to fulfill the needs elsewhere.'"

Id. ¶ 58. Plaintiffs identify a couple of statements about missionary fund donations, such as: "[The Church] also solicits donations for its Missionary Fund.  In its solicitation page, [the Church] describes the purpose of these donations being to 'provide needed funding so that all who want to serve a full-time mission may do so.'"  Id. ¶ 71.  And they identify several saying that "one hundred percent" of donations to Philanthropies and to the Humanitarian Fund are used for their intended purpose, with no overhead.  Id. ¶¶ 7, 64, 65, 67.

Setting aside that Plaintiffs do not allege that they actually donated to any of these programs (and thus lack standing to challenge donated funds to these programs under TransUnion and its progeny), Plaintiffs do not allege that money donated to one fund is ever diverted to another or used for some other purpose (e.g., that fast offering donations are not used "to bless the lives of those in need" or that missionary fund donations do not go to support missionaries who are unable to fund their own mission).  Instead, their objection is that the Church allegedly places some portion of each fund into its reserves and invests it for future use.  See Consol. Compl. ¶ 8.  But again, investing to ensure the Church can cover future (growing) expenses for each of its missions is not diversion; it is prudence.  Ultimately, Plaintiffs do not allege that the Church has done anything other than wisely invest to sustain the Church's mission in all its respects into the future.

As a matter of law, any assertion that investing for future use makes these statements false was rejected by the Utah Supreme Court in Stone.  There, the court recognized that it is "common sense" and "common knowledge" that "all of the funds the Church collects would not be disbursed

immediately and directly" for the intended purpose of the donation, "that there is need for the exercise of <u>management</u> of the funds," and that keeping funds "in savings accounts, bonds, real estate or any type of investment" Church leaders think best is appropriate.[17] <u>Stone</u>, 356 P.2d at 633-34.  A church, like any other charity, has every right to "<u>invest</u> its funds in income-producing property" to make its assets "<u>more productive</u>… to assure the continued validity of [its] spiritual objectives."  <u>Morris v. Scribner</u>, 508 N.E.2d 136, 139 (N.Y. 1987) (rejecting parishioners' attempt to prevent church from constructing a "high-rise commercial office tower" on the Church's Park Avenue property).  And "if the courts will not interfere with the determination of the board of directors of a business corporation honestly and fairly arrived at, [they] certainly should not do so in the case of a <u>religious</u> corporation… whose temporal affairs [are] often actuated by considerations which cannot be measured in terms of dollars and cents."  <u>Id.</u> at 139-40.

In sum, Plaintiffs fail to identify any false statement, and therefore, their fraudulent inducement claim should be dismissed.  <u>See</u>, <u>e.g.</u>, <u>Gaddy I</u>, 451 F. Supp. 3d at 1235.

### 2.  Fraudulent Misrepresentation (Count 4)—Plaintiffs Fail To Plead Falsity

Plaintiffs' fraudulent misrepresentation claim is based on assurances that no "tithing" would be used in the City Creek project.  Plaintiffs allege the funds for City Creek were "withdrawn from Ensign's treasury account, which contained tithing funds."  Consol. Compl. ¶ 178.  But Plaintiffs do not define what they mean by "tithing funds," nor do they plead that the treasury account contained <u>only</u> tithing funds.  Plaintiffs elsewhere aver that Ensign Peak received funds from a <u>variety</u> of Church-related sources, not just tithing.  <u>Id.</u> ¶¶ 79-80, 82-83.

---

[17] Plaintiffs also fail entirely to account for the fact that since 2012, the Church's donation slips have stated: "Though reasonable efforts will be made to use donations as designated, <u>all</u> donations become the Church's property and will be used at the Church's <u>sole</u> discretion to further the Church's <u>overall mission</u>."  Consol. Compl. ¶ 55.  (Similar statements were made to Church members long before 2012 in other sources, such as the Church's General Handbook.)

This is not semantics.  The primary dispute in <u>Huntsman</u>, where these same allegations were advanced, was over the meaning of "tithing."  After the Church submitted evidence that it used "earnings on invested reserves" to pay for City Creek, Huntsman argued that these funds were "tithing," because tithing and earnings on invested reserves are "two sides of the same financial coin."  <u>Huntsman</u>, 2021 WL 4296208, *6 n.4.  The court rejected that argument for two reasons:

> First, for the purposes of this case, tithing funds and earnings on invested tithing funds are not two sides of the same coin because [President] Hinckley expressly distinguished between the two.  Second, because Plaintiff's argument effectively asks this Court to define the term "tithing funds," the First Amendment bars Plaintiff's argument.

<u>Id.</u>  Here, by asserting that "tithing" was used without saying what they mean, Plaintiffs fail to plead with sufficient specificity that the statements at issue were false.  Falsity must be pled with particularity, meaning the plaintiff must "explain why the statement was misleading, and allege with particularity his basis for believing the statement was false."  <u>Nakkhumpun v. Taylor</u>, 782 F.3d 1142, 1147 (10th Cir. 2015).  Plaintiffs fail to do that.  <u>Huntsman</u> also demonstrates that courts cannot resolve a dispute over what "tithing" means, which is an ecclesiastical question.[18]

### 3.    Counts 2 And 4—Plaintiffs Fail To Adequately Plead Reliance

Regarding their fraudulent inducement claim, Plaintiffs make only a general allegation of reliance: "Based on [the Church's] representations, [they] reasonably believed that [their] donations would be used only for the purposes represented by [the Church]."  Consol. Compl. ¶¶ 117-31.  Plaintiffs' reliance allegation for their fraudulent misrepresentation claim is even more conclusory: "Plaintiffs and the Class reasonably relied on these misrepresentations…."  <u>Id.</u> ¶ 181.

---

[18] By a 2-1 vote, a three-judge Ninth Circuit panel reversed the district court's decision.  <u>See</u> <u>Huntsman v. Church</u>, 76 F.4th 962 (9th Cir. 2023).  The panel decision, however, has since been vacated.  <u>Huntsman v. Church</u>, 94 F.4th 781 (9th Cir. 2024) (granting <u>en</u> <u>banc</u> rehearing and vacating decision).

Whether viewed under Rule 12(b)(6) or Rule 9(b), Plaintiffs must plead details of the allegedly false statements "and the consequences thereof."  Koch, 203 F.3d at 1236.  "And as the Tenth Circuit has explained, one 'consequence' that must be pleaded with particularity is the plaintiff's reliance."  Chinitz v. Ally Bank, 2020 WL 1692817, *7 (D. Utah 2020) (citing Parrish v. Arvest Bank, 717 Fed. Appx. 756, 761-62 (10th Cir. 2017)) (explaining plaintiff's "broad allegations regarding her reliance" were insufficient).

In Chinitz, the "lone allegation relating to actual reliance states, 'Plaintiff and the Class Members relied on Ally's misrepresentation to their detriment, as evidenced by them opening and maintaining their Ally accounts and initiating standard ACH transfers into their Ally accounts.'" Chinitz, 2020 WL 1692817, *7.  In words applicable here, the Court explained why this allegation was insufficient:

> The fact Chinitz opened an Ally account and initiated transfers into that account does not demonstrate that Chinitz in fact relied on Ally's alleged misrepresentation in doing so.  Indeed, there is any number of reasons why Chinitz might have opened his Ally account and initiated transfers into that account.  Perhaps Chinitz did so because he sought the convenience of an online bank account that he could access from anywhere.  Or perhaps Chinitz had heard good things about Ally from his friends and that is what motivated his decisionmaking.  Put simply, the SAC fails to allege any causal link between Ally's alleged misrepresentation and the actions Chinitz took.  Therefore, Chinitz has failed to adequately allege that he took any action in actual reliance on Ally's alleged misrepresentation.  Accordingly, Chinitz's fraud claim fails under Utah law.

Id.

Here, Plaintiffs make the same vague reliance assertions the Court rejected in Chinitz. Plaintiffs do not allege they gave tithes or other alms because of the alleged misrepresentations. They do not even allege that they heard or read the alleged misrepresentation.  And, as in Chinitz, there could be "any number of reasons why" Plaintiffs gave tithes—most notably, religious conviction.  Id.  Whatever the reasons, the Consolidated Complaint's "formulaic recitation of the element[]" of reliance is insufficient.  Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008).

In <u>Gaddy III</u>, the plaintiffs claimed they were "induced" to donate "by the Church's claim 'tithing was used only for ecclesiastical purposes, meaning that it was used to… proclaim the gospel, perfect the saints, [] redeem the dead, and care for the poor and needy,' not 'for commercial endeavors to expand a business empire.'" <u>Gaddy III</u>, 665 F. Supp. 3d at 1284. That was insufficient. "Plaintiffs fail to identify specific actions taken… on the basis of any particular misrepresentations." <u>Id.</u> at 1286. "Plaintiffs' allegations… are marked by general descriptions of their lifelong adherence, rather than identification of specific instances in which they relied on a misrepresentation in choosing" to give tithes. <u>Id.</u> at 1288.

Plaintiffs identify here no specific statements about tithing or City Creek—much less false statements—that induced them to give tithes. And the statements the Church's president made about City Creek were not about the use of <u>future</u> tithing donations but rather about what would be done with earnings on <u>past</u> donations. There was <u>no</u> <u>solicitation</u> of funds or representation to rely on. Nor do Plaintiffs identify any specific statements about fast offerings, the Humanitarian Fund, the missionary fund or Philanthropies that induced <u>them</u> to donate. Further, although Plaintiffs' pleading recites alleged assurances that 100% of donations to Philanthropies and the Humanitarian Fund are used for their intended purpose (<u>see</u> Consol. Compl. ¶¶ 64-70), <u>none</u> of the Plaintiffs allege that he or she ever donated to these funds, much less that any particular representation induced them to donate.

Further, any reliance analysis would be fraught with First Amendment problems. Asking why a Church member gives tithes is no different than asking why the person got baptized, prays or engages in any other religious behavior.[19] Religiously-motivated conduct is a matter of faith that transcends logic. "Religious experiences which are as real as life to some may be incomprehensible to others." <u>U.S. v. Ballard</u>, 322 U.S. 78, 86-87 (1944).

---

[19] These same First Amendment issues require striking the class allegations. <u>See</u> Defs.' Motion to Strike Class Allegations (MDL Dkt. 81) at 11-15.

Plaintiffs try to secularize the Church's practice of tithing—turning it from a sacrificial offering to God into nothing different than a donation to any charity.  Whether acknowledged or not, however, tithing is not a secular practice at all but is "inextricably intertwined with ecclesiastical issues." El Pescador, 594 S.W.3d at 658.  This case is really no different than Hawthorne v. Couch, 911 So.2d 907 (La. App. 2005), where the plaintiff alleged that the pastor threatened him with "'judgment and hell'" if he did not give tithes and the court refused to consider his fraud claim, because the "allegations that relate to the validity of his consent are rooted in … religious teachings or beliefs…." Id. at 910-11.  Nor is it different than Gaddy III, where the plaintiffs alleged that the Church induces tithing "by promising eternal salvation, and 'forever families.'" Gaddy III, 665 F. Supp. 3d at 1278-79.  Omitting the religious teachings and motivations behind tithing, as Plaintiffs do, does not alter the fact that "tithing is at its core a purely ecclesiastical matter." Hawthorne, 911 So.2d at 910; see also Peeler v. Way Int'l, 2006 WL 1864662, *9 (Tenn. App. 2006) (holding that the First Amendment barred claim for return of tithing, because the entire context was "unquestionably religious in tenor and content").  Tithing is inextricably linked "to the Church's religious beliefs and practices…." Gaddy III, 665 F. Supp. 3d at 1278.  Any attempt to adjudicate reliance through a purely secular lens ignores reality.  And any attempt to adjudicate reliance while recognizing that tithing is "purely ecclesiastical" violates the First Amendment.  See, e.g., Hawthorne, 911 So. 2d at 910.

For each of these reasons, Counts 2 and 4 of the Consolidated Complaint fail under both Rule 9(b) and Rule 12(b)(6) and should be dismissed with prejudice.

### C.   Plaintiffs Fail To State A Claim For Fraudulent Concealment

Plaintiffs' third cause of action claims the Church fraudulently "concealed the full extent of its holdings," and "concealed that it was… investing." Consol. Compl. ¶¶ 170-71.  "[T]o prevail on a claim for fraudulent concealment, a plaintiff must prove '(1) that the nondisclosed information is material, (2) that the nondisclosed information is known to the party failing to disclose, and

(3) that there is a duty to communicate.'" Gaddy I, 451 F. Supp. 3d at 1235 n.73 (quoting Yazd v. Woodside Homes, 143 P.3d 283, 286 (Utah 2006)).  The silence also "must amount to fraud." McDougal v. Weed, 945 P.2d 175, 179 (Utah 1997).  This claim fails as a matter of law.

### 1.    The Church Did Not Owe Plaintiffs A Duty Of Disclosure

Taking the third element first, whether a duty to disclose exists is "a purely legal question." Yazd, 143 P.3d at 286.  Resolving a similar fraudulent concealment claim, this Court held that "Plaintiffs cannot show that a legal duty exists between the Church and its members requiring disclosure of material financial information."  Gaddy III, 665 F. Supp. 3d at 1291.  Indeed, no authority holds that a church has a "duty to publicly disclose the use of its funds."  Id.  This Court has also recognized that the First Amendment would prohibit imposing such a duty.  Gaddy I, 451 F. Supp. 3d at 1241.  The fraudulent concealment claim fails for this reason alone.

### 2.    Plaintiffs Do Not Plead And Cannot Establish Materiality

"Silence, in order to be actionable fraud, must relate to a material matter…."  Mitchell v. Christensen, 31 P.3d 572, 574 (Utah 2001).  Plaintiffs also do not plead any facts to establish the materiality of the alleged nondisclosures.  While they might claim the nondisclosures were material to them, that is irrelevant.  "[R]easonableness is not based on the subjective state of mind of the person claiming he was misled, but rather is to be based on an objective test, i.e., what would a reasonable person conclude under these circumstances."  Youngblood v. Auto-Owners Ins., 158 P.3d 1088, 1096 (Utah 2007).  Plaintiffs make no attempt to plead what facts are material to a "reasonable person" in deciding whether to give tithes to the Church.

Nor could they.  Tithing is not a quid pro quo exchange that can be judged on a secular scale.  Faithful Church members give tithes to the Church—as opposed to not giving at all or giving to some other church—because the Church teaches that "until the coming of the Son of Man… it is a day of sacrifice, and a day for the tithing of my people."  Doctrine and Covenants § 64:23.  Tithing is "the sacrifice which I, the Lord, require at their hands."  Doctrine and

Covenants § 97:12 .  Tithing is rooted in religious devotion—and in this case, devotion to a specific church and its doctrine.  There is a scaffolding of religious doctrine—most of it unrelated to tithing—that motivates a believer's decision to give tithes to the Church.  Assessing the materiality of one crossbar or bolt would be impossible without assessing the importance and truthfulness of the rest of that scaffolding, an inquiry the First Amendment forbids.  "[I]t is not within the judicial ken to question the centrality of particular beliefs or practices …."  Emp. Div., Dep't of Hum. Res. of Oregon v. Smith, 494 U.S. 872, 887 (1990).

Some questions surely are material to a "reasonable" person's decision to give tithes and other offerings to The Church of Jesus Christ of Latter-day Saints.  Is the Church the "only true and living church" as it claims?  Is the Book of Mormon true?  Was Joseph Smith a prophet?  Does God exist, and does he bless those who give tithes?  Church members give tithes, because they believe the answer to these questions is yes.  They stop giving when doubt or disbelief overcomes faith.  In any case, no court can answer these questions, which is why in Gaddy III this Court concluded that it "cannot adjudicate the duty or materiality elements" of fraudulent concealment "without running afoul of the church autonomy doctrine."  Gaddy III, 665 F. Supp. 3d at 1289. Plaintiffs' fraudulent concealment independently fails for these reasons and should be dismissed with prejudice.

### D.  Plaintiffs Fail To Plead Unjust Enrichment

Plaintiffs' final cause of action asserts unjust enrichment.  Consol. Compl. ¶¶ 183-92.  The elements are: (1) a benefit conferred on one person by another; (2) knowledge by the conferee of the benefit; and (3) acceptance of the benefit such that the conferee cannot equitably retain the benefit without payment of its value.  See Berrett v. Stevens, 690 P.2d 553, 557 (Utah 1984).

This claim fails because the unjustness of the enrichment is based on the alleged fraud, and Plaintiffs fail to plead fraud.  See disc. supra at pp. 20-29 § III, B-C.  It also fails because, by definition, a donation is made without expectation of anything in return, so there is no inequitable

retention of the benefit.  See, e.g., Emergency Physicians v. Salt Lake Cnty., 167 P.3d 1080, 1083 (Utah 2007) (explaining that the purpose of an unjust enrichment claim is for the plaintiff "to receive restitution for the reasonable value of services provided to the defendant").  Moreover, for the reasons explained above, Plaintiffs do not have standing to pursue an unjust enrichment claim. See disc. supra at pp. 19-20 § III, A, 3.

## IV.  PLAINTIFFS' CLAIMS ARE TIME-BARRED

Plaintiffs' claims should also be dismissed with prejudice for the independent reason that those claims are all time-barred under the applicable statutes of limitations.  A statute of limitations defense "may be appropriately resolved on a Rule 12(b) motion when the dates given in the complaint make clear that the right sued upon has been extinguished."  Sierra Club v. Okla. Gas & Elec., 816 F.3d 666, 671 (10th Cir. 2016).  That is the case here.

### A.  Utah's Three-Year Statute Of Limitations Applies To Plaintiffs' Fraud Claims

A transferee court in multidistrict litigation considering state law issues must apply the law that would have applied to the individual cases had they not been transferred.  In re TMJ Implants, 97 F.3d 1050, 1055 (8th Cir. 1996) (citing In re Air Crash Disaster, 644 F.2d 594, 610 (7th Cir. 1981)).  This multidistrict litigation includes cases filed in United States District Courts in Tennessee, Illinois, Washington, California and Utah.  Each of these courts, sitting in diversity, applies the statute of limitations that would be applied by a court of the forum state.  Paulson v. Abbott Labs., 39 F.4th 473, 477 (7th Cir. 2022); Asian Am. Entm't v. Las Vegas Sands, 324 Fed. Appx. 567, 568 (9th Cir. 2009); Phelps v. McClellan, 30 F.3d 658, 661 (6th Cir. 1994); Dow Chem. v. Weevil-Cide, 897 F.2d 481, 483-84 (10th Cir. 1990).

That means Utah's statute of limitations applies, because the forum states each have "borrowing" statutes requiring application of the statute of limitations from the state in which the cause of action arose.  See Cal. Code Civ. Proc. § 361; 735 ILCS 5/13-210; Tenn. Stat. § 28-1-

112; Utah Code § 78B-2-103; RCW 4.18.20.  Plaintiffs' claims arose in Utah, because the alleged

misrepresentations came from Utah and the Defendants are incorporated in Utah.  See Applied

Predictive Techs. v. MarketDial, 598 F. Supp. 3d 1264, 1280-81 (D. Utah 2022).  Although the

analysis considers the place of injury, it carries less weight in fraud claims.  Id.  Thus, under the

forum states' borrowing statutes, Utah's three-year statute of limitations applies.[20]

### B.    Plaintiffs' Fraud Claims Accrued More Than Three Years Before Plaintiffs Filed Suit

The three-year statute for fraud, Utah Code § 78B-2-305, "begin[s] running from the date

a plaintiff either discovered or should have discovered his or her claim."  Russell Packard, 108

P.3d at 746.  This occurs when the plaintiff has "actual knowledge of the fraud or by reasonable

diligence and inquiry should know, the relevant facts of the fraud."  Colosimo, 156 P.3d at 811

(quotation simplified).  A fraud claim has one accrual date—a separate limitations period does not

apply to each alleged misrepresentation.  See Donner v. Nicklaus, 197 F. Supp. 3d 1314, 1326 (D.

Utah 2016).

An injured party "should know" the "relevant facts of the fraud" when he obtains the

"means of knowledge" or the "opportunity of knowing" the facts constituting the fraud.  Id. at

1325.  Learning every detail is not required.  Id. at 1325-26.  Inquiry notice imputes knowledge of

all facts that were discoverable at that time.  Id. at 1325 (citing Colosimo, 156 P.3d at 811).

Publicly available information, including newspaper articles that make the same or similar

allegations a plaintiff makes, triggers inquiry notice, even if the plaintiff does not read them.

Grynberg v. Total S.A., 538 F.3d 1336, 1347-49 (10th Cir. 2008) (Wall Street Journal and New

---

[20] In any case, all the forum states except Illinois have a three-year statute of limitations for fraud. Kahn v. Deutsche Bank, 978 N.E.2d 1020, 1028-29 (Ill. 2012); Colosimo v. Roman Catholic Bishop, 156 P.3d 806, 811 (Utah 2007); Russell Packard Dev. v. Carson, 108 P.3d 741, 747 (Utah 2005); Cal. Code Civ. Proc. § 338(d); Tenn. Stat. § 28-3-105; RCW 4.16.080; Vera v. REL-BC, 66 Cal. App. 5th 57, 65-66 (Cal. Ct. App. 2021); Shepard v. Holmes, 345 P.3d 786, 738 (Wash. App. 2014); Med. Educ. v. East Tenn. State Univ., 19 S.W.3d 803, 817 (Tenn. App. 1999). Illinois applies a five-year statute of limitations to fraud.  See 735 ILCS 5/13-205.

York Times articles put plaintiff on notice of claims). It is not necessary that a publication "discuss each and every aspect of the alleged fraudulent activity" or fully "expose the scam" to create inquiry notice. Sterlin v. Biomune Sys., 154 F.3d 1191, 1203-04 (10th Cir. 1998) (Barron's article put plaintiff on notice of claims). "[S]torm warnings" about "the possibility of fraudulent activity" impose an obligation to investigate.[21] Id. at 1204. Accord Hughes v. Vanderbilt Univ., 215 F.3d 543, 548 (6th Cir. 2000) (press coverage established "constructive knowledge of the events underlying [plaintiff's] cause of action"); McIntyre v. U.S., 367 F.3d 38, 60 (1st Cir. 2004) (press coverage gave plaintiff "duty to inquire"); United Klans v. McGovern, 621 F.2d 152, 154 (5th Cir. 1980) ("widespread publicity" triggers inquiry notice).

Plaintiffs' Consolidated Complaint cites and relies on three publications that prove Plaintiffs were on inquiry notice of the Church's alleged misconduct by December 2019 (or February 2020 at the latest): (1) the December 17, 2019 Letter To An IRS Director; (2) a February 8, 2020 Wall Street Journal article titled The Mormon Church Amassed $100 Billion; and (3) a February 8, 2020 Salt Lake Tribune article titled LDS Church Kept The Lid On Its $100 Billion Fund.[22] These are just three of dozens of publications in that time frame about the Church's finances, all triggered by the IRS Letter.[23]

---

[21] While Sterlin gives plaintiffs additional time to investigate before the claim accrues, that rule only applies in actions under Section 10(b) of the Securities Exchange Act of 1934. Donner, 197 F. Supp. 3d at 1328 n.12. It "does not apply to Utah's statutory discovery rule for fraud…." Id.

[22] The Whistleblower report is cited numerous times in the Consolidated Complaint, and Plaintiffs provide a hyperlink: Letter To An IRS Director. The Consolidated Complaint also cites to the Wall Street Journal and Salt Lake Tribune articles referred to above but did not contain a hyperlink. Those hyperlinks are provided in the text above for the Court's convenience.

[23] A list of some of those articles (with hyperlinks to those articles) is provided as Exhibit 1 hereto. The Court can take judicial notice "of news articles… for proof that something is publicly known, not for the truth of the article's other assertions." Est. of Lockett v. Fallin, 841 F.3d 1098, 1111 (10th Cir. 2016). To be clear, however, judicial notice of these articles is not necessary to resolve this motion. The Consolidated Complaint sufficiently exposes what Plaintiffs knew or should have known.

Among other things, the IRS Letter alleges:

- "[C]ontrary to its only reason for existing—Ensign has never fulfilled its purported purpose for LDS nor functioned as a charitable entity. Instead for more than two decades, it has done only one thing: it has collected donations collected by LDS, without ever disbursing these funds towards any charitable purpose." Consol. Compl. ¶ 82 & nn. 32-33 (citing Letter To An IRS Director at 6).

- "Ensign has never made a single expenditure for any religious, educational, or charitable objective—and it has no plans to ever spend any of the money it has gathered, instead acting as a massive hedge fund that never reinvests funds into the LDS." Id. ¶ 83 & n. 34 (citing Letter To An IRS Director at 6).

- "LDS deliberately keeps its use of Ensign shrouded in secrecy." Id. ¶ 84 & n. 35 (citing and quoting Whistleblower report at 21).

The IRS Letter is also the source of the allegations that the Church used "tithing" to finance City Creek construction. Id. ¶¶ 106-10.

The Wall Street Journal and Salt Lake Tribune articles repeated these allegations and made the existence and contents of the IRS Letter even more widely known:

- A former employee filed a whistleblower complaint with the IRS revealing that Ensign had "stockpiled $100 billion" and that the Church had "improperly used" some Ensign funds. The Mormon Church Amassed $100 Billion; LDS Church Kept The Lid On Its $100 Billion Fund.

- "[Ensign Peak] also created a system of more than a dozen shell companies to make its stock investments harder to track…." The Mormon Church Amassed $100 Billion.

- "The [whistleblower] report alleged the fund made no charitable contributions, despite being incorporated as a tax-exempt charity." Id.

- "The whistleblower also accused Ensign Peak of illegally using tax-exempt donations to bail out two business ventures during the financial crisis—a life insurance company the church owned and City Creek Center…." Id.

- "Neilsen accused Ensign of taking in billions from members' tithes and other donations and not spending any of it over a 22-year period for charitable purposes." LDS Church Kept The Lid On Its $100 Billion Fund.[24]

---

[24] The Court can consider documents referenced in or attached to a complaint on a Rule 12(b)(6) motion. Broker's Choice, 861 F.3d at 1103-04. Plaintiffs repeatedly cite, quote from and copy and paste excerpts from the IRS Letter. See Consol. Compl. ¶¶ 39 & n.6, 79-91, 105-07, 113. Plaintiffs also cite the Wall Street Journal Article and the Salt Lake Tribune article. Id. ¶ 102 & nn. 46-47. Plaintiffs' base their claims on these documents. While the Church by no means admits their accuracy, their existence and contents are undisputed. See Fed. R. Evid. 901.

That Plaintiffs could have timely filed is confirmed by the fact that others did.  On March 22, 2021, more than two years <u>before</u> any of these Plaintiffs filed suit, James Huntsman filed a similar complaint also rooted in the IRS Letter's allegations.[25]  <u>See Huntsman</u>, 2021 WL 4296208, *2.  And the Second Amended Complaint in <u>Gaddy</u> (filed on October 22, 2021) also made the same kinds of fraud allegations Plaintiffs make here.  <u>See Gaddy III</u>, 665 F. Supp. 3d at 1283-86.

Plaintiffs' fraud claims accrued in February 2020 at the latest.  The earliest any of these Plaintiffs filed suit was on October 31, 2023.  The statute of limitations bar is clear from the face of their pleading, and thus the Court can resolve this question as a matter of law.  <u>See Russell Packard</u>, 108 P.3d at 751; <u>see also McIntyre</u>, 367 F.3d at 58-61 (finding record "sufficient to establish notice" at motion-to-dismiss stage based on local and national news coverage of facts underlying plaintiff's claim).  The Court should dismiss Plaintiffs' fraud claims as time-barred.

### C.  Equitable Tolling Does Not Apply

Plaintiffs recognize their statute of limitations problem and thus assert in their Consolidated Complaint that the limitations period should be equitably tolled.  <u>See</u> Consol. Compl. ¶¶ 46-52.  But the equitable discovery rule applies <u>only</u> when there is no statutory discovery rule.  <u>See Innovasis v. English</u>, 2023 WL 8627757, *3 (D. Utah 2013); <u>Donner</u>, 197 F. Supp. 3d at 1329 ("Under Utah law, the statutory discovery rule and the equitable discovery rules are 'mutually exclusive.'") (quoting <u>Nolan v. Hoopiiaina</u>, 144 P.3d 1129 (Utah 2006)).  Utah's statute of limitations for fraud contains a discovery rule, so equitable discovery rules cannot apply.  <u>Innovasis</u>, 2023 WL 8627757, at *3.

### D.  Plaintiffs' Claim For Breach Of Fiduciary Duty Is Barred

Plaintiffs appear to rely on the Utah Charitable Solicitations Act (UCSA) as the source of the Church's alleged fiduciary duty to them.  <u>See</u> Consol. Compl. ¶¶ 147-48.  If so, that claim is

---

[25] Many of the underlying complaints in this MDL are patterned after the complaint in <u>Huntsman</u> and were filed in the wake of the now vacated 2-1 panel decision.  <u>See Huntsman</u>, 94 F.4th 781.

subject to the three-year statute of limitations for liability "created by the statutes of th[e] state" and is therefore barred.  Utah Code § 78B-2-305(4).  Alternatively, all claims that "regardless of their specific labels, are based on the same core allegations of deception, false representations, and fraudulent conduct" are subject to the fraud statute of limitations.  Security Sys. v. Alder Holdings, 421 F. Supp. 3d 1186, 1194 (D. Utah 2019); see also Corbrus v. 8th Bridge Cap., 2021 WL 2781811, *8 (C.D. Cal. 2021); Johnson v. Bank of Am., 2015 WL 7776808, *4 (C.D. Cal. 2015).  Plaintiffs allege the Church breached its fiduciary duty by "failing to use the donations as represented" and "misrepresent[ing] their use of the donated funds."  Consol. Compl. ¶ 153. Their fiduciary duty claim is barred for either of these reasons.

### E.  Plaintiffs' Unjust Enrichment Claim Is Also Time-Barred

The statute of limitations for unjust enrichment is generally four years.  See Sumsion v. Bay Harbor Farm, 427 P.3d 511, 520 (Utah App. 2018) (citing Utah Code § 78B-2-307(3)).  But Plaintiffs' unjust enrichment claim arises from the alleged fraud.   Plaintiffs claim the Church was unjustly enriched, because it "made material misrepresentations" to Plaintiffs (Consol. Compl. ¶ 184), Plaintiffs "donated money… in reliance on those misrepresentations" (id. ¶ 187), and the Church "retained the donated funds, despite [its] knowledge that the statements made to solicit the donations were false and misleading" (id. ¶ 190).  This claim is also therefore subject to the fraud statute of limitations and is barred.  See Security Sys., 421 F. Supp. 3d at 1194.

Assuming the four-year catch-all statute applies, the claim accrued when Plaintiffs either knew or should have known that they would get nothing in return for the "benefit" they conferred on the Church.  See Pero v. Knowlden, 336 P.3d 55, 59-60 (Utah App. 2014).  Plaintiffs always knew they would not receive any secular benefit in return for their donations to the Church.  See Consol. Compl. ¶¶ 21-34.  Because Plaintiffs knew this well more than four years before they filed suit, their unjust enrichment claim is time-barred.  See Pero, 336 P.3d at 59-60 (plaintiff's unjust

enrichment claim time-barred where plaintiff knew defendant did not intend to return plaintiff's property more than four years before plaintiff filed suit).

## CONCLUSION

"The Tenth Circuit analogizes" claims barred by the Church Autonomy Doctrine "to a government official's defense of qualified immunity." <u>Gaddy III</u>, 665 F. Supp. 3d at 1281 (citing <u>Bryce</u>, 289 F.3d at 654). When it applies, "plaintiffs have no claim for which relief may be granted." <u>Id.</u> Plaintiffs' claims are thus barred by the Church Autonomy Doctrine, and they have no way around that. They also have no way around the statute of limitations.

Rule 15 says leave to amend should be given "freely… when justice so requires." Fed. R. Civ. P. 15(a)(2). But justice requires leave to amend only "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief." <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962). That is not the case here with Plaintiffs' sweeping assault on the Church's First Amendment right to exercise its religion free from judicial, administrative or legislative interference. Accordingly, Consolidated Class Action Complaint (MDL Dkt. 63) should be dismissed <u>with</u> <u>prejudice</u>.

Date: September 10, 2024

Respectfully submitted,

*/s/ Mark S. Mester*
Mark S. Mester, *Counsel for Defendant*
*The Church of Jesus Christ of Latter-day Saints*

Jason R. Burt (Utah Bar No. 11200)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200
Email: jason.burt@lw.com

Mark S. Mester (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700
Email: mark.mester@lw.com

David J. Jordan (Utah Bar No. 1751)
Wesley F. Harward (Utah Bar No. 15623)
FOLEY & LARDNER LLP
95 South State Street, Suite 2500
Salt Lake City, Utah  84111
Telephone: (801) 401-8900
Email: djordan@foley.com
          wharward@foley.com

Randy T. Austin (Utah Bar No. 6171)
Wade L. Woodard (Utah Bar No. 18155)
Justin W. Starr (Utah Bar No. 10708)
KIRTON MCCONKIE PC
36 South State Street, Suite 1900
Salt Lake City, Utah  84111
Telephone: (801) 328-3600
Email: raustin@kmclaw.com
          wwoodard@kmclaw.com
          jstarr@kmclaw.com